7/13/2022 5:11:22 PM

# Compare Results

| Old File: | | New File: |
|---|---|---|
| **20-827_orig.pdf** | versus | **20-827_new2.pdf** |
| **77 pages (1.26 MB)** | | **77 pages (1.30 MB)** |
| 7/13/2022 5:07:35 PM | | 7/13/2022 5:08:13 PM |

**Total Changes**

**3**

**Content**

2 Replacements

0 Insertions

1 Deletion

**Styling and Annotations**

0 Styling

0 Annotations

Go to First Change (page 35)

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## UNITED STATES *v.* HUSAYN, AKA ZUBAYDAH, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 20–827. Argued October 6, 2021—Decided March 3, 2022

In the aftermath of the September 11, 2001, terrorist attacks, the Central Intelligence Agency believed that Abu Zubaydah was a senior al Qaeda lieutenant likely to possess knowledge of future attacks against the United States. Zubaydah—currently a detainee at the Guantánamo Bay Naval Base—says that in 2002 and 2003 he was held at a CIA detention site in Poland, where he was subjected to "enhanced interrogation" techniques. In 2010, Zubaydah filed a criminal complaint in Poland, seeking to hold accountable any Polish nationals involved in his alleged mistreatment at the CIA site ostensibly located in that country. The United States denied multiple requests by Polish prosecutors for information related to Zubaydah's claim on the ground that providing such information would threaten national security. Zubaydah filed a discovery application pursuant to 28 U. S. C. §1782, which permits district courts to order production of testimony or documents "for use in a proceeding in a foreign . . . tribunal." Zubaydah asked for permission to serve two former CIA contractors with subpoenas requesting information regarding the alleged CIA detention facility in Poland and Zubaydah's treatment there. The Government intervened and asserted the state secrets privilege in opposition to Zubaydah's discovery request.

The District Court rejected the Government's claim that merely confirming that a detention site was operated in Poland would threaten national security. The District Court nevertheless dismissed Zubaydah's discovery application. It concluded that the state secrets privilege applied to operational details concerning the CIA's cooperation with a foreign government, and that meaningful discovery could not proceed without disclosing privileged information. On appeal, the

Ninth Circuit agreed with the District Court that much of the information sought by Zubaydah was protected from disclosure by the state secrets privilege, but the panel majority concluded that the District Court had erred when it dismissed the case. It believed that the state secrets privilege did not apply to publicly known information. The panel majority also concluded that because the CIA contractors were private parties and not Government agents, they could not confirm or deny anything on the Government's behalf. Given these holdings, the panel majority determined that discovery into three topics could continue: the existence of a CIA detention facility in Poland, the conditions of confinement and interrogation at that facility, and Zubaydah's treatment at that location.

*Held*: The judgment is reversed, and the case is remanded.

938 F. 3d 1123, reversed and remanded.

JUSTICE BREYER delivered the opinion of the Court with respect to all but Parts II–B–2 and III, concluding that, in the context of Zubaydah's §1782 discovery application, the Court of Appeals erred in holding that the state secrets privilege did not apply to information that could confirm or deny the existence of a CIA detention site in Poland. Pp. 7–13, 14–15, 18.

(a) The state secrets privilege permits the Government to prevent disclosure of information when that disclosure would harm national security interests. *United States* v. *Reynolds,* 345 U. S. 1, 10–11. To assert the privilege, the Government must submit to the court a "formal claim of privilege, lodged by the head of the department which has control over the matter." *Id.,* at 7–8. "The court itself must determine whether the circumstances are appropriate for the claim of privilege." *Id.,* at 8. However, in making that determination, a court should exercise its traditional "reluctan[ce] to intrude upon the authority of the Executive in military and national security affairs," *Department of Navy* v. *Egan,* 484 U. S. 518, 530. If the Government has offered a valid reason for invoking the privilege, "the showing of necessity" by the party seeking disclosure of the ostensibly privileged information will "determine how far the court should probe in satisfying itself that the occasion for invoking the privilege is appropriate." *Reynolds,* 345 U. S., at 11. The narrow evidentiary dispute before the Court asks how these principles apply to Zubaydah's specific discovery requests. Pp. 7–9.

(b) In certain circumstances, the Government may assert the state secrets privilege to bar the confirmation or denial of information that has entered the public domain through unofficial sources. Here, the information held by the Ninth Circuit to be nonprivileged would necessarily tend to confirm (or deny) that the CIA maintained a detention site in Poland. The Government has shown that such information—

even if already made public through unofficial sources—could significantly harm national security. The CIA Director stated in his declaration that "clandestine" relationships with foreign intelligence services are "critical" and "based on mutual trust that the classified existence and nature of the relationship will not be disclosed." App. to Pet. for Cert. 135a–136a. Given the nature of Zubaydah's specific discovery requests there is a reasonable danger that in this case a former CIA insider's confirmation of confidential cooperation between the CIA and a foreign intelligence service could badly damage the CIA's clandestine relationships with foreign authorities. Pp. 9–13.

(c) The CIA contractors' confirmation (or denial) of the information Zubaydah seeks would be tantamount to disclosure by the CIA itself. The contractors worked directly for the CIA and had a central role in the events in question. The CIA Director describes the harm that would result from the contractors responding to the subpoenas, not the risks of a response from the CIA (or any other CIA official or employee). Pp. 14–15.

(d) Zubaydah's need for location information is not great, perhaps close to nonexistent. At oral argument, he suggested that he did not seek confirmation of the detention site's Polish location so much as he sought information about what had happened there. P. 15.

(e) Here, the state secrets privilege applies to the existence (or nonexistence) of a CIA facility in Poland, and therefore precludes further discovery into all three categories of information the Ninth Circuit concluded to be nonprivileged. P. 15.

(f) This case is remanded with instructions to dismiss Zubaydah's current application for discovery under §1782. P. 18.

BREYER, J., delivered the opinion of the Court, except as to Parts II–B–2 and III. ROBERTS, C. J., joined that opinion in full, KAVANAUGH and BARRETT, JJ., joined as to all but Part II–B–2, KAGAN, J., joined as to all but Parts III and IV and the judgment of dismissal, and THOMAS and ALITO, JJ., joined Part IV. THOMAS, J., filed an opinion concurring in part and concurring in the judgment, in which ALITO, J., joined. KAVANAUGH, J., filed an opinion concurring in part, in which BARRETT, J., joined. KAGAN, J., filed an opinion concurring in part and dissenting in part. GORSUCH, J., filed a dissenting opinion, in which SOTOMAYOR, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports.  Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

—————

No. 20–827

—————

## UNITED STATES, PETITIONER *v.* ZAYN AL-ABIDIN MUHAMMAD HUSAYN, AKA ABU ZUBAYDAH, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[March 3, 2022]

JUSTICE BREYER delivered the opinion of the Court, except as to Parts II–B–2 and III.\*

Abu Zubaydah, a detainee in the Guantánamo Bay Naval Base, and his attorney filed an *ex parte* 28 U. S. C. §1782 motion in Federal District Court seeking to subpoena two former Central Intelligence Agency contractors.  Zubaydah sought to obtain information (for use in Polish litigation) about his treatment in 2002 and 2003 at a CIA detention site, which Zubaydah says was located in Poland.  See 28 U. S. C. §1782 (permitting district courts to order production of testimony or documents "for use in a proceeding in a foreign . . . tribunal").  The Government intervened.  It moved to quash the subpoenas based on the state secrets privilege.  That privilege allows the Government to bar the disclosure of information that, were it revealed, would harm national security.  *United States* v. *Reynolds*, 345 U. S. 1, 6–7 (1953).

The Court of Appeals for the Ninth Circuit mostly accepted the Government's claim of privilege.  *Husayn* v.

——————

\*JUSTICE KAGAN joins all but Parts III and IV of this opinion and the judgment of dismissal.

*Mitchell*, 938 F. 3d 1123, 1134 (2019). But it concluded that the privilege did not cover information about the location of the detention site, which Zubaydah alleges to have been in Poland. *Ibid.* The Court of Appeals believed that the site's location had already been publicly disclosed and that the state secrets privilege did not bar disclosure of information that was no longer secret (and which, in any event, was being sought from private parties). *Id.,* at 1132–1133. The Government argues that the privilege should apply because Zubaydah's discovery request could force former CIA contractors to confirm the location of the detention site and that confirmation would itself significantly harm national security interests. In our view, the Government has provided sufficient support for its claim of harm to warrant application of the privilege. We reverse the Ninth Circuit's contrary holding.

I

A

For present purposes, we can assume the following: In the aftermath of the September 11, 2001, terrorist attacks, the CIA believed that Zubaydah was a senior al Qaeda lieutenant likely to possess knowledge of future attacks against the United States. S. Rep. No. 288, 113th Cong., 2d Sess., p. 21, and n. 60 (2014) (SSCI Report). In March 2002, Zubaydah was captured by Pakistani government officials working with the CIA. *Id.,* at 21. The CIA then transferred him to a detention site that some sources allege was located in Thailand. *Id.,* at 22–23; see also 3 Record 552.

Zubaydah remained at this location for several months. SSCI Report 22, 67. During that time he was subjected to what the Government then called "enhanced interrogation" techniques, including waterboarding, stress positions, cramped confinement, and sleep deprivation. *Id.,* at 40–41. The Government has since concluded that this treatment constituted torture. See Press Conference by the President,

Office of the Press Secretary, Aug. 1, 2014, https://obamawhitehouse.archives.gov/the-press-office/2014/08/01/press-conference-president.

In December 2002, the CIA transferred Zubaydah to a different detention site—the site at issue here. SSCI Report 67. The CIA has never confirmed its location, but Zubaydah and many others believe it was in Poland.

In September 2006, the Government transferred Zubaydah to its detention facility at the Guantánamo Bay Naval Base. 3 Record 583. He has been detained in Guantánamo Bay ever since. 938 F. 3d, at 1125.

Some of this information and related details have appeared in various publicly-available documents, including:

- The almost-500 page Executive Summary of a Senate Select Committee on Intelligence Report concerning the CIA's use of "enhanced interrogation" techniques. See generally SSCI Report.

- The European Court of Human Rights' findings concerning Zubaydah's treatment, which that court concluded had taken place in Poland. 3 Record 382–607.

- Testimony given by James Mitchell and John Jessen, the former CIA contractors who are the targets of Zubaydah's subpoenas and who designed and implemented the CIA's post-September 11 enhanced-interrogation program. *Id.,* at 106–149; Tr. in *United States* v. *Khalid Shaikh Mohammad, et al.* (Jan. 21–31, 2020).

- Mitchell's memoir of his involvement with the CIA's enhanced-interrogation program. See generally J. Mitchell & B. Harlow, Enhanced Interrogation: Inside the Minds and Motives of the Islamic Terrorists Trying to Destroy America (2016).

Some of these and other publicly available sources say that, in 2002 and 2003, Zubaydah was detained at a CIA

facility in Poland. But, the Government states, the CIA itself has never confirmed that one or more of its clandestine detention sites was located in any specific foreign country. App. to Pet. for Cert. 134a. Neither, as far as we can tell from the record, have the contractors Mitchell and Jessen named the specific foreign countries in which CIA detention sites were located. Rather, they (like the SSCI Report) have used code names to refer to the locations where Zubaydah was held. See, *e.g.,* SSCI Report 62; Tr. in *United States* v. *Khalid Shaikh Mohammad, et al.* (Jan. 21, 2020), at 30190. Finally, although at least one former Polish government official has stated that Poland cooperated with the CIA, to our knowledge, the Polish government itself has never confirmed such allegations. 3 Record 472.

## B

### 1

In 2010, lawyers representing Zubaydah filed a criminal complaint in Poland asking prosecutors there to hold accountable any Polish nationals who were involved in his alleged mistreatment in that country. 938 F. 3d, at 1127. Invoking a Mutual Legal Assistance Treaty, the Polish prosecutors asked American authorities for information. 3 Record 441. The United States Department of Justice refused their request on the ground that providing the information would adversely affect our national security. *Id.,* at 444; see also App. to Brief for Petitioner 4a. The Polish investigation closed without prosecutions. 938 F. 3d, at 1127.

In 2015, the European Court of Human Rights considered the matter. It concluded that the CIA had held and tortured Zubaydah at a site located in Poland. 3 Record 558. It also stated that Poland had failed adequately to investigate the human rights violations that the court believed had occurred on Polish soil. *Id.,* at 581.

In response, the Polish prosecutors reopened their investigation. 938 F. 3d, at 1128. They again requested information from the United States under the Mutual Legal Assistance Treaty, and the United States again denied their requests. *Ibid.*; see also 3 Record 632–633. At that point, the Polish prosecutors invited Zubaydah's lawyers to submit evidence that would aid their investigation.

2

Soon afterward, Zubaydah (and his lawyer) filed the *ex parte* 28 U. S. C. §1782 discovery application now before us. 938 F. 3d, at 1128. Section 1782 says that a district court may order a person in its district to provide testimony or documents "for use in a proceeding in a foreign . . . tribunal, including criminal investigations conducted before formal accusation." Zubaydah asked for permission to serve the contractors, Mitchell and Jessen, with subpoenas commanding them to appear for depositions and to produce "documents, memoranda and correspondence" regarding an alleged CIA detention facility in Poland and Zubaydah's treatment there. The Appendix, *infra,* at 19–20, lists Zubaydah's document requests. Twelve of Zubaydah's thirteen document requests referred to Poland, and 10 specifically requested documents "concerning" an alleged CIA detention facility located in Stare Kiejkuty, Poland. *Ibid.* The District Court granted Zubaydah's request. App. to Pet. for Cert. 70a.

The Government intervened. 938 F. 3d, at 1129. Section 1782(a) provides that a "person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege." The Government claimed that disclosure of the information Zubaydah sought would violate the state secrets privilege. 938 F. 3d, at 1129. It asked the court to quash the subpoenas. *Ibid.*

To support its privilege claim, the Government submitted

a declaration from the Director of the CIA. App. to Pet. for Cert. 123a–137a. The Director said that Mitchell and Jessen's response to Zubaydah's subpoenas would, in this case, confirm or deny whether Poland had cooperated with the CIA. *Id.,* at 129a–130a. And that confirmation, the Director explained, would significantly harm our national security interests. *Id.,* at 131a.

The District Court granted the Government's motion to quash the subpoenas. *Id.,* at 60a. It did not accept the Government's claim "that merely confirming [that] a detention site was operated in Poland would pose a grave risk to national security." *Id.,* at 59a. But it nonetheless thought the state secrets privilege applied. It concluded that the state secrets privilege allowed the Government to suppress "*operational details* concerning the specifics of cooperation with a foreign government, including the roles and identities of foreign *individuals*." *Id.,* at 55a–56a (emphasis added). And it believed that it was not possible to conduct "[m]eaningful discovery . . . in this matter" without disclosing these (or other) protected types of information. *Id.,* at 57a. The court rejected Zubaydah's suggestion that it would be possible to conduct further discovery through the use of code names that would conceal the locations of CIA detention facilities. *Id.,* at 55a–57a. The court consequently dismissed Zubaydah's §1782 application. *Id.,* at 60a.

Zubaydah appealed. A divided panel of the Court of Appeals for the Ninth Circuit affirmed in part and reversed in part. The panel listed the following examples of privileged information sought by Zubaydah: "documents, memoranda, and correspondence about the identities and roles of foreign individuals involved with the detention facility, operational details about the facility, and any contracts made with Polish government officials or private persons residing in Poland [that] might implicate the CIA's intelligence gathering efforts." 938 F. 3d, at 1134; see also Appendix, *infra,*

at 19–20. But the panel majority held that the District Court nonetheless should not have dismissed the case. That was because, in its view, the state secrets privilege did not apply to information that was already publicly known. 938 F. 3d, at 1133. It added that because Mitchell and Jessen are "private parties," their disclosures would not tend to show that the Government itself had "confirm[ed] or den[ied] anything." *Ibid.*

More specifically, the panel majority wrote that three categories of information were not covered by the state secrets privilege: "the fact that the CIA operated a detention facility *in Poland* in the early 2000s; information about the use of interrogation techniques and conditions of confinement *in that detention facility*; and details of Abu Zubaydah's treatment *there*." *Id.,* at 1134 (emphasis added). The panel then remanded the case to the District Court for further proceedings. *Id.,* at 1135, 1137–1138.

The Court of Appeals denied, over a twelve-judge dissent, the Government's request for rehearing en banc. 965 F. 3d 775 (2020). We granted the Government's petition for certiorari to determine whether the Court of Appeals erred. We believe that it did.

## II

### A

The state secrets privilege permits the Government to prevent disclosure of information when that disclosure would harm national security interests. See *Reynolds*, 345 U. S., at 10–11 (disclosure of Air Force accident investigation report could disclose "military secrets"); *In re Sealed Case*, 494 F. 3d 139, 144 (CADC 2007) (disclosure of inspector general reports would "create the risk of revealing covert operatives, organizational structure and functions, and intelligence-gathering sources, methods, and capabilities"); see also *Molerio* v. *FBI*, 749 F. 2d 815, 819, 822 (CADC 1984) (Scalia, J.) (disclosure of FBI's rationale for not hiring

plaintiff "would impair the national security").

To assert the privilege, the Government must submit to the court a "formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer." *Reynolds*, 345 U. S., at 7–8. "The court itself must determine whether the circumstances are appropriate for the claim of privilege." *Id.,* at 8. "Judicial control over the evidence in a case cannot be abdicated to the caprice of executive officers." *Id.,* at 9–10. Nonetheless, in assessing the Government's claim that disclosure may harm national security, courts must exercise the traditional "reluctan[ce] to intrude upon the authority of the Executive in military and national security affairs." *Department of Navy* v. *Egan*, 484 U. S. 518, 530 (1988).

Although the court itself must assess the sufficiency of the Government's privilege claim, "the showing of necessity which is made," by the party seeking disclosure of the ostensibly privileged information, "will determine how far the court should probe in satisfying itself that the occasion for invoking the privilege is appropriate." *Reynolds*, 345 U. S., at 11. "Where there is a strong showing of necessity, the claim of privilege should not be lightly accepted." *Ibid.* In contrast, "where necessity is dubious, a formal claim of privilege," demonstrating "a reasonable possibility" of harm to national security, "will have to prevail." *Ibid.* And in all events, "even the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that military secrets are at stake." *Ibid.*

JUSTICE GORSUCH agrees that the Government must show a reasonable danger of harm to national security, that a court must decide for itself whether the occasion is appropriate for claiming the privilege, and that *in camera* review is not always required to make that determination. *Post,* at 17–19 (dissenting opinion). We diverge from the dissent on how those principles should apply to the specific discovery

requests Zubaydah has made in this litigation. Of course, our answer to that question is not a judgment of Zubaydah's alleged terrorist activities, nor of his treatment at the hands of the United States Government. Obviously the Court condones neither terrorism nor torture, but in this case we are required to decide only a narrow evidentiary dispute.

## B

An important factor in our analysis of that narrow issue is the specific language of Zubaydah's discovery requests and the Ninth Circuit's opinion, which both make it clear that any response Mitchell and Jessen give to Zubaydah's subpoenas would tend to confirm (or deny) the existence of a CIA detention site in Poland. As we have said, 12 of Zubaydah's 13 document requests contain the word "Poland" or "Polish." Appendix, *infra,* at 19–20. (The exception is a broad request for any and all documents concerning Zubaydah himself. *Ibid.*) Ten of the requests specifically seek "documents, correspondence, or memoranda . . . concerning" the alleged CIA detention site in Stare Kiejkuty, *Poland. Ibid.* If Mitchell and Jessen acknowledge the existence of documents responsive to these requests, they will effectively acknowledge the existence of the detention facility referenced therein. Conversely, denying the existence of responsive documents would deny the existence of such a facility. In any event, any response to the lion's share of Zubaydah's document requests will either confirm or deny that the CIA operated a detention site in Poland.

The problem is confirmed by the Ninth Circuit's opinion, which allowed continued discovery into three topics: the existence of a CIA detention facility in *Poland*, the conditions of confinement and interrogation at *that* facility, and Zubaydah's treatment at *that* location. 938 F. 3d, at 1134. The first category, of course, requires Mitchell and Jessen

to directly confirm or deny the existence of a Polish deten-
tion site.  The latter two categories require, at the very
least, confirmation or denial, since acknowledging that any
confinement, interrogation, or treatment occurred at a CIA
detention facility located in Poland would confirm that such
a facility exists or existed.

Because any response to Zubaydah's subpoenas allowed
by the Ninth Circuit's decision will have the effect of confir-
mation or denial (by the Government or its former contrac-
tors) of the existence of a CIA facility in Poland, the primary
question for us must be whether the existence (or non-ex-
istence) of a CIA detention facility in Poland falls within the
scope of the state secrets privilege.  For the reasons that
follow, we conclude that it does.

1

We agree with the Government that sometimes infor-
mation that has entered the public domain may nonetheless
fall within the scope of the state secrets privilege.  But see
938 F. 3d, at 1133 ("[I]n order to be a 'state secret,' a fact
must first be a 'secret'").  The Government here has pro-
vided a reasonable explanation of why Mitchell and
Jessen's confirmation or denial of the information
Zubaydah seeks could significantly harm national security
interests, even if that information has already been made
public through unofficial sources.

The CIA Director stated in his declaration that the
Agency's counterterrorism efforts rely on "clandestine" re-
lationships with foreign intelligence services.  App. to Pet.
for Cert. 130a–131a.  The Director explained that foreign
intelligence services "are a critical intelligence source,"
whose help is "vital to our world-wide efforts to collect in-
telligence and thwart terrorist attacks."  *Ibid.*

He further explained that these "sensitive" relationships
with other nations are "based on mutual trust that the clas-
sified existence and nature of the relationship will not be

disclosed." *Id.,* at 135a–136a. To confirm the existence of such a relationship would "breach" that trust and have "serious negative consequences," including jeopardizing "relationships with other foreign intelligence or security services." *Id.,* at 131a–132a. In light of these concerns, the CIA "has steadfastly refused to confirm or deny the accuracy" of public speculation about its cooperation with Poland, leaving "an important element of doubt about the veracity" of that speculation, providing "an additional layer of confidentiality," and at least confirming that the United States will "stand firm in safeguarding any coordinated clandestine activities," despite the passage of time, the existence of media reports, and changes in public opinion. *Id.,* at 133a–136a. In a word, to confirm publicly the existence of a CIA site in Country A, can diminish the extent to which the intelligence services of Countries A, B, C, D, etc., will prove willing to cooperate with our own intelligence services in the future.

JUSTICE GORSUCH believes that the Government has failed to meet its "burden of showing that a 'reasonable danger' of harm to national security would follow from sharing the information sought." *Post,* at 21–22. In his view, the Director's declaration is insufficient to demonstrate "that requiring the government to acknowledge [that the CIA did or did not operate a detention facility in Poland in the early 2000s] would invite a reasonable danger of additional harm to national security." *Post,* at 22–23. We disagree. It stands to reason that a former CIA insider's confirmation of confidential cooperation between the CIA and a foreign intelligence service could damage the CIA's clandestine relationships with foreign authorities. Confirmation by such an insider is different in kind from speculation in the press or even by foreign courts because it leaves virtually no doubt as to the veracity of the information that has been confirmed. And there is ample reason to think that the circum-

stances of this case—particularly the specific discovery requests at issue here—could lead to this kind of confirmation. In any event, the CIA's refusal to confirm or deny its cooperation with foreign intelligence services plays an important role in and of itself in maintaining the trust upon which those relationships are based.

Nor, as JUSTICE GORSUCH believes, do we reach this conclusion by incorrectly placing the burden on Zubaydah to disprove the Government's assertion of harm. *Post,* at 23. To the contrary, we agree with JUSTICE GORSUCH that the Government bears the burden of showing that the privilege should apply—we simply disagree with his conclusion that it failed to meet that burden here. In our view, the Director's declaration adequately establishes "that there is a reasonable danger that compulsion of the evidence [at issue] will expose . . . matters which, in the interest of national security, should not be divulged." *Reynolds*, 345 U. S., at 10. And we have found nothing in the evidentiary record that casts doubt on our conclusion that the Government has met its burden here. *Reynolds* itself contemplated that a similar basis for a claim of privilege could prevail without further examination by the court of the ostensibly privileged evidence. *Id.,* at 9–11.

In contrast, JUSTICE THOMAS, referring to *Reynolds,* believes that we need not consider the Government's justifications for invoking the privilege at all because Zubaydah has not made a "'strong showing of necessity'" for the requested information. *Post,* at 1–2 (opinion concurring in part and concurring in judgment). *Reynolds*, however, taken as an example, indicates that the Government initially must formally invoke the privilege. 345 U. S., at 8. Then the court itself must "determine whether the circumstances are appropriate for the claim of privilege." *Ibid.* And only after satisfying itself that the Government has offered a valid reason for invoking the privilege would a court turn to the issue of necessity (a matter that would help the

court determine how deeply to probe the details of, and basis for, the Government's privilege claim). *Id.,* at 10–11. We follow *Reynolds'* example here.

2

Additionally, the Government cites legal authority from the separate but roughly analogous Freedom of Information Act (FOIA) context, which supports our conclusion that the CIA's concerns warrant application of the state secrets privilege. Brief for Petitioner 32–34. The FOIA contains exemptions that permit an agency to withhold Government records that a member of the public has requested and which the agency would otherwise have to disclose. 5 U. S. C. §552. But the exemptions do *not* apply (and the agency must make the information available) if the information has already become public, *provided that it has been "officially acknowledged" by the agency from which the information is sought. Fitzgibbon* v. *CIA*, 911 F. 2d 755, 765 (CADC 1990) (emphasis added). The Court of Appeals held that, under the circumstances present in *Fitzgibbon,* if there has been "official acknowledgment" then the agency must disclose the information despite the exemption. *Ibid.* If the agency has not officially acknowledged the information, however, then it may withhold the information (under an applicable exemption) despite the fact that the information has become public. *Ibid.*

To be clear, the FOIA doctrine is only an (imperfect) analogy, and nothing in this opinion should be taken to suggest that the waiver standards in that area apply directly to the state secrets privilege. However, the principles underlying the FOIA rule provide at least some support for the Government's position here. Lower courts have explained that the official acknowledgement doctrine recognizes the reality that official confirmation of sensitive information may pose risks that unofficial disclosure does not. "It is one thing for a reporter or author to speculate or guess that a thing may

be so or even, quoting undisclosed sources, to say that it is so; it is quite another thing for one in a position to know of it officially to say that it is so." *Alfred A. Knopf, Inc.* v. *Colby*, 509 F. 2d 1362, 1370 (CA4 1975). Official confirmation may dispel "lingering doubts" or reveal that the information currently in the public domain is incomplete or itself a cover story. *Military Audit Project* v. *Casey*, 656 F. 2d 724, 744–745 (CADC 1981).

This logic helps to explain why disclosure by Mitchell and Jessen could be harmful in ways that disclosure by other sources would not. Here, the Government has not confirmed or otherwise officially acknowledged the existence of a CIA detention site in Poland and it has explained why, under these circumstances, confirmation of that information could reasonably be expected to significantly harm national security interests. That is sufficient to demonstrate that "the occasion for the privilege is appropriate." *Reynolds*, 345 U. S., at 10. (The Polish government has also never confirmed whether it cooperated with the CIA, so we need not decide in this case what significance, if any, that disclosure would have.)

3

The Court of Appeals also believed that, because Mitchell and Jessen are "private parties," their "disclosures [were] not equivalent to the United States confirming or denying anything." 938 F. 3d, at 1133. We do not agree with this conclusion. Mitchell and Jessen worked directly for the CIA as contractors. Zubaydah contends (without contradiction) that Mitchell and Jessen "devised and implemented" the CIA's enhanced-interrogation program and that they personally interrogated Zubaydah. Brief for Respondents 1–2. Given Mitchell and Jessen's central role in the relevant events, we believe that their confirmation (or denial) of the information Zubaydah seeks would be tantamount to a dis-

closure from the CIA itself.  Indeed, the CIA Director's Dec-
laration describes the harm that would result from Mitchell
and Jessen responding to the subpoenas, not the risks of a
response from the CIA (or any other CIA official or em-
ployee).

#### 4

At the same time, Zubaydah's need is not great.  At oral
argument Zubaydah suggested that he did not seek confir-
mation of the detention site's Polish location so much as he
sought information about what had happened there.  Tr. of
Oral Arg. 44 ("We know where Abu Zubaydah was.  We
want to establish how he was treated there").

#### 5

For these reasons, we conclude that in this case the state
secrets privilege applies to the existence (or nonexistence)
of a CIA facility in Poland.  It therefore precludes further
discovery into all three categories of information the Ninth
Circuit concluded to be nonprivileged because, as we have
explained, such discovery will inevitably confirm or deny
the existence of such a facility.  See *supra,* at 8–10.

### III

While JUSTICE KAGAN and JUSTICE GORSUCH would send
the case back for additional proceedings, we believe that it
must be dismissed.  Although application of the state se-
crets privilege does not always require dismissal, we are
unpersuaded that the litigation at issue here, founded upon
the specific document requests set forth in the Appendix,
*infra,* at 19–20, can survive the Government's successful
privilege claim.

JUSTICE GORSUCH first suggests that we should remand
for the District Court to conduct "*in camera* review of any
evidence the government might wish to present to substan-
tiate its privilege claim." *Post,* at 24.  It is true that some-
times a court must personally review the evidence at issue

in order to assess the Government's assertion of the state secrets privilege. See *Reynolds*, 345 U. S., at 10. However, additional judicial probing is inappropriate here for two reasons taken together. First, for the reasons explained above, the CIA Director's affidavit, together with the lack of contrary evidence, is sufficient to "satisfy [us] . . . that there is a reasonable danger that compulsion of the [privileged] evidence will expose . . . matters which, in the interest of national security, should not be divulged." *Ibid.* Second, the necessity of additional judicial probing depends, as we have explained, on Zubaydah's need for the information he seeks. We have explained that much of that information is already publicly available from other sources. *Supra*, at 3. The public availability of information concerning Zubaydah's treatment diminishes his need for the discovery he seeks from Mitchell and Jessen, and thus for further judicial probing of the Government's privilege claim. See *Reynolds*, 345 U. S., at 11 ("necessity [is] greatly minimized by an available alternative"). Zubaydah's need for information about his treatment may be further diminished by the Government's representation that (subject to a security review) it will allow Zubaydah "to send a declaration that could be transmitted to Polish prosecutors." Letter from B. Fletcher, Acting Solicitor General, to S. Harris, Clerk of Court 3 (Oct. 15, 2021). And, as we just said, Zubaydah's counsel stated at oral argument: "We know where Abu Zubaydah was. We want to establish how he was treated there." Tr. of Oral Arg. 44.

Alternatively, both JUSTICE KAGAN and JUSTICE GORSUCH suggest that even if "the existence [or nonexistence] of a detention site in Poland really does qualify as a state secret," we should nonetheless remand so that discovery may continue on a different topic: Zubaydah's treatment from "December 2002 through September 2003 and without reference to geography." *Post,* at 24 (GORSUCH, J., dissenting); see also *post,* at 2–5 (KAGAN, J., concurring in part and

dissenting in part). In their view, "familiar judicial tools," such as protective orders and code names, would be adequate to protect against the possibility of an "inadvertent disclosur[e]" of privileged information. *Post,* at 25 (opinion of GORSUCH, J.); see also *post,* at 3–4 (opinion of KAGAN, J.).

Unfortunately, this suggestion ignores the nature of the specific discovery requests at issue here. It may well be that such techniques have successfully prevented the disclosure of classified information in previous litigation on related subject matter. See *post,* at 25–26 (opinion of GORSUCH, J.) (describing protective measures used to prevent disclosure of classified information in *United States* v. *Khalid Shaikh Mohammad* and *Salim* v. *Mitchell*, No. 2:15–cv–286 (ED Wash.)). But the nature of this case (an exclusively discovery-related proceeding aimed at producing evidence for use by Polish criminal investigators) and the specific discovery requests before us convince us that these techniques would not be effective here. In particular, as we have already explained, both the subpoena's language and the Ninth Circuit's decision are such that any response to Zubaydah's discovery requests would inevitably tend to confirm or deny whether the CIA operated a detention site located in Poland. *Supra*, at 8. All this is true regardless of protective measures that might be employed by the courts below. Of course, we need not and do not here decide whether a different discovery request filed by Zubaydah might avoid the problems that preclude further litigation regarding the requests at issue here.

Finally, JUSTICE GORSUCH ignores the nature of this litigation. This case arises from Zubaydah's *ex parte* application for discovery under §1782. It is a purely evidentiary proceeding and thus unlike most litigation, which may, after a successful assertion of the state secrets privilege, "continue without the government's privileged proof." *Post,* at 24. Here, the privilege blocks Zubaydah's discovery requests, which are the proceeding's sole object. Given that

Opinion of the Court

fact, we can see no reason to remand for further proceedings.

## IV

We reverse the judgment of the Ninth Circuit and remand the case with instructions to dismiss Zubaydah's current application for discovery under §1782.

*It is so ordered.*

# APPENDIX

**SCHEDULE OF DOCUMENTS TO BE PRODUCED**

1.    All documents, memoranda and correspondence concerning the establishment of the detention facility in Stare Kiejkuty, Poland.

2.    All documents, memoranda and correspondence concerning the operation, purpose, and use of the detention facility in Stare Kiejkuty, Poland.

3.    All documents, memoranda and correspondence concerning the identity of (present or former) Polish officials involved in the establishment or operation of the detention facility in Stare Kiejkuty, Poland.

4.    All documents, memoranda and correspondence generated by (present or former) Polish officials between 2001 and 2005.

5.    All documents, memoranda and correspondence generated by Respondent between 2001 and 2005 concerning the detention facility in Stare Kiejkuty, Poland.

6.    All documents, memoranda and correspondence generated by Respondent when in Poland, between 2001 and 2005, concerning the detention facility in Stare Kiejkuty, Poland.

7.    All documents, memoranda and correspondence concerning Petitioner Abu Zubaydah.

8.    All documents, memoranda and correspondence between Polish officials and U.S. personnel concerning the detention facility at Stare Kiejkuty, Poland.

9.    All documents, memoranda and correspondence concerning the detention facility at Stare Kiejkuty's access to Polish amenities such as water and electricity.

10.   All documents, memoranda and correspondence concerning the use of interrogation techniques, conditions of confinement, and torture of those being held in Stare Kiejkuty, Poland.

11.   All documents, memoranda and correspondence concerning any contracts made between Polish government officials or private persons residing in Poland and U.S. personnel for the use of the property upon which the detention facility at Stare Kiejkuty sat.

12.   All documents, memoranda and correspondence concerning any exchange of money between Polish officials and those operating the detention facility in Stare Kiejkuty, Poland.

13.   All documents, memoranda and correspondence concerning flights in and out of Stare Kiejkuty, Poland between 2001 and 2005.

# SUPREME COURT OF THE UNITED STATES

_____

No. 20–827

_____

UNITED STATES, PETITIONER *v.* ZAYN AL-ABIDIN MUHAMMAD HUSAYN, AKA ABU ZUBAYDAH, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[March 3, 2022]

JUSTICE THOMAS, with whom JUSTICE ALITO joins, concurring in part and concurring in the judgment.

Under *United States* v. *Reynolds*, 345 U. S. 1 (1953), a court evaluates the Government's assertion of the state-secrets privilege based on "the showing of necessity . . . made" by the party requesting discovery. *Id.,* at 11. If the party makes only "a dubious showing of necessity," the claim of privilege "will have to prevail" without judicial scrutiny into the Government's basis for the claim. *Ibid.* If the party makes "a strong showing of necessity," however, immediate dismissal of the discovery request is not required. *Ibid.* A court may then ask whether there is a "reasonable danger" that "military secrets are at stake." *Id.*, at 10–11. In answering that question, the court must afford "the utmost deference" to the Executive's national-security assessment. *Department of Navy* v. *Egan*, 484 U. S. 518, 530 (1988) (internal quotation marks omitted). "[I]f the court is ultimately satisfied that military secrets are at stake," "even the most compelling necessity cannot overcome the claim of privilege." *Reynolds,* 345 U. S., at 11.

The Court acknowledges that Abu Zubaydah's need for discovery from two CIA contractors is "not great," *ante,* at 15, but it declines to dismiss Zubaydah's discovery application on that basis. Rather, the Court concludes that the Government "has provided a reasonable explanation" why

Zubaydah's proposed discovery "could significantly harm national security interests." *Ante,* at 10. In my view, Zubaydah's "dubious" need for the discovery he seeks requires dismissal of his discovery application, regardless of the Government's reasons for invoking the state-secrets privilege. I, therefore, join only Part IV of the Court's opinion.

I

Abu Zubaydah is a terrorist. Before his detention, he was an al Qaeda-associated senior operative engaged in active hostilities against the United States. See generally Factual Return for Abu Zubaydah (ISN 10016), pp. 1–44, in *Husayn* v. *Austin*, No. 08–cv–1360 (DDC), ECF Doc. 474–1, pp. 24–67 (Factual Return). Between 1994 and 2000, Zubaydah was the "key facilitator" for the "Khaldan camp," a terrorist training center in eastern Afghanistan. *Id.,* at 14, ¶33; see also *Barhoumi* v. *Obama*, 609 F. 3d 416, 425 (CADC 2010); National Commission on Terrorist Attacks upon the United States, The 9/11 Commission Report, pp. 59, 175 (2004) (9/11 Report). Among other responsibilities, Zubaydah secured forged passports and visas for terrorist trainees, provided safe harbor for the trainees at a "guesthouse," and managed the training camp's expenses. Factual Return 14, ¶33; see also 9/11 Report 169, 178. Numerous Khaldan-trained terrorists committed acts of terrorism against the United States, including Khalid al-Mihdhar, the al Qaeda hijacker who crashed American Airlines Flight 77 into the Pentagon on September 11, 2001. Factual Return 18, ¶41a; see also 9/11 Report 73 (noting evidence that suggested the 1993 World Trade Center bombing "plot or plots were hatched at or near the Khaldan camp").

After the September 11 attacks, Zubaydah "joined enemy forces against the United States," "facilitated the retreat and escape of enemy forces out of Afghanistan," and continued "plotting attacks against the United States." Factual

Return 11, ¶28. From sites in Afghanistan and Pakistan, Zubaydah commanded a terrorist militia closely associated with al Qaeda and Osama bin Laden. See *id.,* at 25–32, ¶¶49–62; *Ali* v. *Obama*, 736 F. 3d 542, 546–548 (CADC 2013) (Kavanaugh, J.). Zubaydah had his followers trained in English, electronics, and explosives. See Factual Return 40–41, ¶¶67–68. He planned to wage war against the United States by planting remotely operated bombs in various public locations. See *id.,* at 43, ¶73. In his diary, Zubaydah reflected that it would be "a lot better" to carry out a nuclear attack if a nuclear weapon ever became "available." *Id.,* at 44, ¶73 (emphasis deleted). Zubaydah wanted "[a] general war, *non stop and without mercy.*" *Ibid.*

On March 28, 2002, U. S. and allied forces captured Zubaydah at his safe house in Faisalabad, Pakistan. *Id.,* at 32, ¶63; *Ali*, 736 F. 3d, at 543. Zubaydah "used the Faisalabad house to prepare for attacks on U. S. and Coalition forces using remote-detonated explosives." *Id.*, at 546–547. After his capture, the CIA transferred Zubaydah to several detention sites abroad before detaining him at Guantánamo Bay Naval Base, where he remains today. Between March 2002 and September 2006, CIA interrogation of Zubaydah yielded 766 disseminated intelligence reports. S. Rep. No. 113–288, p. 46 (2014). "Zubaydah provided information on al-Qa'ida activities, plans, capabilities, and relationships, in addition to information on its leadership structure, including personalities, decision-making processes, training, and tactics." *Ibid.* (internal quotation marks omitted).

In this case, Zubaydah seeks discovery under 28 U. S. C. §1782 from two former CIA contractors, James Mitchell and John Jessen. Zubaydah does not request this discovery for his own use. Rather, Polish prosecutors asked Zubaydah to file a discovery application after the United States repeatedly declined the prosecutors' requests for information regarding CIA operations at an alleged detention site in Poland. See *ante,* at 4–5; *Husayn* v. *Mitchell*, 965 F. 3d 775,

782 (CA9 2020) (Bress, J., dissenting from denial of rehearing en banc). Zubaydah claims to have been detained and tortured at that site, and Polish authorities are investigating those allegations. The United States now moves to quash Zubaydah's §1782 application by invoking the state-secrets privilege, citing national-security interests.

## II
## A

In *Reynolds*, this Court held that the Government may invoke the state-secrets privilege whenever "there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged." 345 U. S., at 10. Upon the Government's "formal claim of privilege," "[t]he court itself must determine whether the circumstances are appropriate for the claim of privilege, and yet do so without forcing a disclosure of the very thing the privilege is designed to protect." *Id.,* at 7–8 (footnote omitted).

*Reynolds* prescribed a two-step framework instructing courts "how far [they] should probe in satisfying [themselves] that the occasion for invoking the privilege is appropriate." *Id.*, at 11. First, courts must assess the requesting party's need for the Government's privileged material. If the party's need is "dubious," a formal claim of privilege "will have to prevail" without judicial inquiry into the basis for the Government's claim. *Ibid.* A party has a dubious need unless it can show that the proposed discovery is "immediately and essentially applicable" to the party's case. *United States* v. *Burr*, 25 F. Cas. 30, 37 (No. 14,692d) (CC Va. 1807) (Marshall, C. J.). For example, a "dubious showing of necessity" arises if a party has an "available alternative" to privileged material that might "giv[e him] the evidence to make out [his] case without forcing a showdown on the claim of privilege." *Reynolds*, 345 U. S., at 11. Likewise, a party's need is dubious if it is "possible . . . to adduce

the essential facts . . . without resort to material touching upon military secrets." *Ibid.*

Second, if a party has made a "strong showing of necessity," immediate dismissal of the discovery request is not required. *Ibid.* The court may then ask whether there is a "reasonable danger" that "military secrets are at stake." *Id.*, at 10–11. When answering that question, *in camera* review is not "automati[c]," *id.,* at 10, but rather "a last resort," *Larson* v. *Department of State*, 565 F. 3d 857, 870 (CADC 2009) (internal quotation marks omitted). And, in all cases, the court must afford the "utmost deference" to the Executive's assessment of national-security threats. *Egan*, 484 U. S., at 530 (internal quotation marks omitted).[1] Such deference is required because it is the responsibility of the Executive, "not that of the judiciary, to weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk of compromising" the Nation's safety. *CIA* v. *Sims*, 471 U. S. 159, 180 (1985). Ultimately, if the court is "satisfied

---

[1] JUSTICE BREYER suggests that case law under the Freedom of Information Act (FOIA) might provide a "roughly analogous" framework for courts to assess the Government's claim of state-secrets privilege. *Ante,* at 13 (plurality opinion). Yet, at the same time, JUSTICE BREYER admits that the analogy is "imperfect," and stresses that "nothing in [his] opinion should be taken to suggest" that FOIA law is "directly" relevant. *Ibid.* No party has proposed a FOIA approach to state secrets, presumably because the statute has no apparent connection to the state-secrets privilege. Like the parties, I do not think that FOIA is relevant in this context. This Court has held that FOIA's "basic purpose" is to "open agency action to the light of public scrutiny," regardless of the "particular purpose for which the document is being requested." *Department of Justice* v. *Reporters Comm. for Freedom of Press*, 489 U. S. 749, 772 (1989) (internal quotation marks omitted). That "basic purpose" is antithetical to the state-secrets privilege, which exists to protect "military matters [that] should not be divulged," even when a party demonstrates "the most compelling necessity." *Reynolds*, 345 U. S., at 10, 11. Thus, FOIA favors disclosure regardless of a party's need, while the state-secrets privilege mandates secrecy even if need is at its zenith.

that military secrets are at stake," "even the most compelling necessity cannot overcome the claim of privilege." *Reynolds*, 345 U. S., at 11; see also *Trump* v. *Vance*, 591 U. S. ___, ___ (2020) (THOMAS, J., dissenting) (slip op., at 10).

*Reynolds* itself involved only a "dubious" need for privileged material. The plaintiffs were widows of three civilians who died when a military flight "testing secret electronic equipment" crashed. 345 U. S.*,* at 3. The plaintiffs filed suit under the Federal Tort Claims Act, 28 U. S. C. §1346 *et seq.*, and the Government invoked the state-secrets privilege to withhold the Air Force's accident investigation report and related materials. See 345 U. S.*,* at 3–4. The Court sustained the privilege because the plaintiffs "posed the privilege question for decision with the formal claim of privilege set against a dubious showing of necessity." *Id.,* at 11. Specifically, the plaintiffs had adduced "nothing to suggest that the electronic equipment . . . had any causal connection with the accident," making discovery into the equipment unnecessary. *Ibid.* The Government also had "offered to make the surviving crew members available for examination," but the plaintiffs declined that invitation. *Ibid.* For these reasons, and *not* because the Court independently assessed whether "military secrets [were] at stake," *ibid.*, the Court found the plaintiffs' need "dubious" and ordered the dismissal of their discovery request.

B

In this case, the Court inverts the *Reynolds* test so that courts *first* ask whether the Government "has offered a valid reason for invoking the privilege," and *then* ask whether the requesting party has demonstrated sufficient need for the discovery. *Ante,* at 12. Now, a court "turn[s] to the issue of necessity" not to determine whether to evaluate the Government's reasons for invoking the state-secrets privilege, but rather to ascertain "how deeply to

probe the details of, and basis for, the Government's privilege claim." *Ante,* at 13.

*Reynolds* squarely forecloses the Court's reasons-first approach. Regardless of need, a claim of privilege must prevail once the Government has given a "valid reason" to support it, because "even the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that military secrets are at stake." *Reynolds*, 345 U. S., at 11. The Court offers no explanation how a court might discern a "valid reason" to invoke the state-secrets privilege without also being "satisfied" that state secrets are in issue. Here, to determine whether the Government has offered a "valid reason," the Court even searched "the evidentiary record" to ensure that "nothing . . . casts doubt on [its] conclusion." *Ante*, at 12. Thus, to start by evaluating the Government's reasons for privilege, as the Court does, leaves *Reynolds*' analysis of need with no role to play. That result is flatly inconsistent with *Reynolds*, where the Court did not evaluate the Government's reasons to support its privilege claim, but instead ordered dismissal of the discovery request in light of the plaintiffs' "dubious showing of necessity." 345 U. S., at 11. In upending *Reynolds*' test, the Court fails to grapple with or even discuss *Reynolds*' analysis.

Unfortunately, by invoking need as *Reynolds*' second step, with a cryptic instruction to "probe" the Government's reasons yet more "deeply," *ante,* at 13, the Court twice puts the Nation's security at risk. First, any judicial inquiry more searching than the Court's analysis here likely will lead to *in camera* review whenever the requesting party demonstrates adequate need. Because the Court already dissects the CIA Director's declaration, see *ante,* at 10–11, it is unclear how else the Government could support its privilege claim other than by disclosing evidence *in camera*. But making *in camera* review turn on the party's need improperly prescribes "automati[c] . . . disclosure to the judge"

in the narrow but important class of cases for which the moving party demonstrates adequate need. *Reynolds*, 345 U. S., at 10. Such an approach also ignores that "examination of the evidence . . . by the judge alone" "jeopardize[s] the security which the privilege is meant to protect." *Ibid.* While the Executive can control its subordinates' access to state secrets and enforce penalties if such material is mishandled, it has little control once state secrets fall into the Judiciary's hands. Disclosure to a judge, therefore, poses a very real national-security threat. The plurality's cavalier statement that "sometimes" *in camera* review is warranted fails even to acknowledge that risk. *Ante,* at 15.

Second, the Court's inverted *Reynolds* test undermines the "utmost deference" owed to the Executive's national-security judgments. *Egan*, 484 U. S., at 530 (internal quotation marks omitted). While the Court purports to apply that standard in this case, see *ante,* at 8, it then instructs courts to "probe" more "deeply" the "basis for . . . the Government's privilege claim" when need is established, *ante*, at 13. This will inevitably result in "judicial second-guessing" of core national-security determinations, "defeat[ing] the unity, secrecy, and dispatch that the Founders believed to be so important" to the Executive Branch. *Hamdi* v. *Rumsfeld*, 542 U. S. 507, 592 (2004) (THOMAS, J., dissenting); see also The Federalist No. 64, pp. 392–393 (C. Rossiter ed. 1961) (because "perfect *secrecy* [is] sometimes requisite" in international affairs, the President must be "able to manage the business of intelligence in such manner as prudence may suggest").

## C

JUSTICE KAVANAUGH joins the Court's opinion but would reframe its test. Rather than invert *Reynolds*' two-step approach, he maintains that the Government's assertion of privilege should prompt a "threshold judicial inquiry" in which a court asks whether "the 'circumstances indicat[e] a

reasonable possibility' that state secrets are involved." *Post,* at 1 (opinion concurring in part) (quoting *Reynolds,* 345 U. S., at 11). JUSTICE KAVANAUGH fails to describe what this analysis entails, other than to characterize it as "not demanding" and the result as "typically self-evident." *Post*, at 1. But his *Reynolds* step 0 cannot be meaningfully different from the Court's upfront demand for reason giving. He concedes that this is a case of "'dubious' need," *post,* at 1 (quoting *Reynolds*, 345 U. S., at 11), so he cannot think that the Court properly applies *Reynolds*' second step. He also joins the Court's analysis in relevant part, which indicates that his "threshold judicial inquiry" includes both the Court's searching evaluation of the CIA Director's declaration *and* its review of the record to ensure that nothing "casts doubt" on the Director's explanation. See *ante,* at 12 (majority opinion). In short, JUSTICE KAVANAUGH's tripartite test must likewise require plenary (though deferential) review at the "threshold," with more exacting review (sometimes including *in camera* review) as the party's need grows.

To be sure, *Reynolds* acknowledged that the Government raised the state-secrets privilege "under circumstances indicating a reasonable possibility that military secrets were involved." 345 U. S*.,* at 10–11. JUSTICE KAVANAUGH relies on that language to create *Reynolds* step 0. See *post,* at 1 (opinion concurring in part). But *Reynolds* did not envision the threshold reason-giving requirement that JUSTICE KAVANAUGH proposes and the Court now applies. Instead, in discussing the "circumstances," *Reynolds* merely characterized the facts of the case: There was "a reasonable possibility that military secrets were involved" because the case involved "a military plane which had gone aloft to test secret electronic equipment." 345 U. S*.,* at 10–11. It did not require a "threshold judicial inquiry" to make that observation. Nor does it require any meaningful "inquiry" to ob-

serve that this case involves an alleged clandestine deten-tion site. Again, *Reynolds'* only "threshold inquiry" was to assess the plaintiffs' need for the Government's privileged material. That is why the Court decided that the Govern-ment's claim of privilege "cut off further demand for the doc-uments on the showing of necessity" *without* assessing the validity of the Government's reasons. *Id.,* at 11. The Court and JUSTICE KAVANAUGH's reasons-first, need-later ap-proach has no basis in our case law.

## D

Finally, JUSTICE GORSUCH would dispense with *Reynolds* and instruct judges to evaluate *de novo* the Government's invocation of the state-secrets privilege. He does not say "*de novo*," but his analysis makes the point clear. He sum-marily dismisses the CIA Director's 15-page declaration as a "conclusory assertion," *post,* at 23 (dissenting opinion), proposes that courts "often should" review state secrets *in camera*, *post,* at 18, and then suggests that courts "inde-pendently" evaluate that privileged information, *post*, at 15. This approach finds no support in *Reynolds*, *Egan*, or re-lated cases, see Part II–A, *supra*, as JUSTICE GORSUCH ef-fectively concedes. He rejects *Egan*, see, *e.g., post*, at 17, and he criticizes *Reynolds* for accepting the Government's claim of privilege "at face value" "without even pausing to review" the privileged information, *post*, at 15. True, quot-ing *Reynolds*, JUSTICE GORSUCH indicates that courts should ask whether discovery would present a "'reasonable danger'" to national security. *Post*, at 17 (quoting 345 U. S., at 10). But the question remains: in whose judgment? His answer is clear: *our* "independent judgment." *Post,* at 17.

JUSTICE GORSUCH offers three arguments to support *de novo* judicial review of a state-secrets claim, none of which has merit. First, he asserts that "courts generally must respect . . . the ancient rule that the public enjoys a right to 'every man's evidence.'" *Post*, at 11 (quoting 4 J.

Wigmore, Evidence in Trials at Common Law §2192, p. 2965 (1905)). But whatever "right" there may be to civil discovery generally,[2] there is no "right" to state secrets specifically. As Wigmore explained, when any of "the various privileges" applies, the obligation to produce evidence is "not insisted upon." *Id.*, at 2967. The state-secrets privilege, of course, is "a privilege which is well established in the law of evidence." *Reynolds*, 345 U. S., at 6–7; see also *Totten* v. *United States*, 92 U. S. 105 (1876); *Burr*, 25 F. Cas., at 37. Thus, to assert a "right" to discovery proves nothing, because the formal claim of the state-secrets privilege overrides it here.

Second, JUSTICE GORSUCH posits that "[b]ecause Congress has expressly authorized the Judiciary to entertain this suit" by enacting §1782, "it follows that we may not reflexively defer to the Executive's wish to see it dismissed." *Post*, at 12, n. 10. But that argument "omits an important caveat found in the same [provision]" on which JUSTICE GORSUCH relies. *Ibid.* Section 1782(a) provides: "A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege." Thus, far from inviting *de novo* review, Congress instructed federal courts to apply all privileges—including the state-secrets privilege—with full

———————

[2] But see, *e.g.,* 4 St. George Tucker, Blackstone's Commentaries 381–382 (1803) (discussing limits on discovery at common law, including the lack of "complete discovery by the oath of the parties"; "a compulsive power for the production of books and papers belonging to the parties"; and "powe[r] to examine witnesses abroad"); E. Sunderland, Scope and Method of Discovery Before Trial, 42 Yale L. J. 863, 866–867 (1933) (discussing limits on discovery in equity); S. Subrin, Fishing Expeditions Allowed: The Historical Background of the 1938 Federal Discovery Rules, 39 Boston College L. Rev. 691, 694 (1998) ("Historically, discovery [was] extremely limited in both England and the United States"); *id.,* at 695 (at common law, "a party could neither take the stand nor force the opposing party to do so").

force.  Invoking §1782 merely presents anew the question in this case: what does the state-secrets privilege require.[3]

Third, JUSTICE GORSUCH invokes Chief Justice Marshall's two opinions in the *Burr* prosecution, but both cut decisively against him.  In 1807, the Federal Government prosecuted Aaron Burr, the former Vice President, for treason and, later, misdemeanor incitement.  *Vance*, 591 U. S., at ___, ___ (slip op., at 3, 7).  Burr moved for a subpoena *duces tecum* ordering President Jefferson to produce a letter from General James Wilkinson, Burr's principal accuser.  *Id.,* at ___–___ (slip op., at 4–5).  Chief Justice Marshall explained that it "d[id] not . . . appear to the court that the president d[id] object to the production of any part of [Wilkinson's] letter."  *United States* v. *Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807); see also *Burr*, 25 F. Cas., at 31, 37.  But "[h]ad the president" done so and "subjected [the letter] to certain restrictions, and stated that in his judgment the public interest required certain parts of it to be kept secret," Chief Justice Marshall assured that "all proper respect would have been paid" to the President's invocation of privilege.  *Burr*, 25 F. Cas., at 192.

JUSTICE GORSUCH nonetheless reasons that it would not have been enough, to defeat the subpoena, for President Jefferson to have objected on state-secrets grounds.  Chief Justice Marshall supposedly would have required the President to "'state the particular reasons'" for withholding the Wilkinson letter, and the court then could have "decide[d] for itself whether to sustain a claim of privilege."  *Post,* at 12 (quoting *Burr*, 25 F. Cas., at 192).  JUSTICE GORSUCH's argument by selective quotation is incorrect.  Chief Justice Marshall explained that "on objections being made by the president to the production of a paper, the court *would not*

——————
[3] JUSTICE GORSUCH eventually recognizes that neither the supposed "duty to produce every man's evidence" nor §1782 actually supports his position.  *Post,* at 17, n. 12.  He concedes that both sources simply present "the question *when* the state secrets privilege applies."  *Ibid.*

*proceed further in the case* without such an affidavit as would clearly sh[o]w the paper to be essential to the justice of the case." *Id*., at 192 (emphasis added); see also *Burr*, 25 F. Cas., at 37 ("If it does contain any matter which . . . it is not the wish of the executive to disclose, such matter, if it be not immediately and essentially applicable to the point, will, of course, be suppressed"). That analysis tracks *Reynolds*' first step: The Government invokes the state-secrets privilege, and the privilege will prevail unless the requesting party makes the requisite showing of need. Thus, JUSTICE GORSUCH is simply incorrect that "Chief Justice Marshall nowhere suggested that the state secrets privilege should apply in this country without . . . a statement" of reasons to support the privilege. *Post,* at 13, n. 11.

JUSTICE GORSUCH further errs in asserting that a reviewing court must demand a statement of reasons and then "decide for itself" whether those reasons are adequate. *Post,* at 12. Quite the opposite: Chief Justice Marshall explained that "[t]he president *may*," not must, "state the particular reasons" for his claim of privilege, and that the court will "*unquestionably allow . . . full force* to those reasons," 25 F. Cas., at 192 (emphasis added), not "decide for itself" whether they pass muster, *post*, at 12. That analysis follows *Reynolds*' second step: If there is adequate need, the Government may explain the basis for privilege and the court affords "utmost deference" or "full force" to those reasons. The reality of *Burr*, then, is the opposite of what JUSTICE GORSUCH proposes.

Ultimately, JUSTICE GORSUCH's animating concern is that judicial deference to the Executive's national-security judgments risks collapsing "the many points of difference" between our Chief Executive and the 18th-century British monarch. *Burr*, 25 F. Cas., at 34. Not so. This Court's standard of utmost deference bears little relation to "the privilege the English crown enjoyed." *Post,* at 13. In contrasting the American Executive and the British monarch,

Chief Justice Marshall explained that only a king could not be made "to appear under the process of the court," and therefore he alone could object even to the issuance of a subpoena. *Burr*, 25 F. Cas., at 34. The President, meanwhile, must move to quash a subpoena rather than object to "its being issued," and then he may invoke "the law of evidence" as grounds "for not obeying the process of the court." *Ibid.* That is precisely how the Executive Branch proceeded here. After the District Court first granted Zubaydah's discovery application, the Government moved to quash it in light of the state-secrets privilege. See *ante,* at 5–6. To eviscerate that privilege, as JUSTICE GORSUCH proposes, would not protect the Nation from monarchy. Rather, it would contravene the "constitutional directive" that the Executive has "primary responsibility—along with the necessary power—to protect the national security." *Zivotofsky* v. *Kerry*, 576 U. S. 1, 34 (2015) (THOMAS, J., concurring in judgment in part and dissenting in part) (internal quotation marks omitted).

## III

While the Court recognizes that Zubaydah's need for discovery from Mitchell and Jessen is "not great," *ante,* at 15; see also *ante,* at 16 (plurality opinion), it refuses to dismiss Zubaydah's discovery application in light of his "dubious showing of necessity," *Reynolds*, 345 U. S., at 11. Instead, as explained above, the Court begins at *Reynolds*' second step and concludes that the Government "has provided a reasonable explanation" why Zubaydah's proposed discovery "could significantly harm national security interests." *Ante,* at 10.[4] I agree that the Government has offered, at

_____

[4] Elsewhere, JUSTICE BREYER notes that the "Polish government has also never confirmed whether it cooperated with the CIA," and he therefore declines to decide "what significance, if any, that disclosure would have." *Ante,* at 14 (plurality opinion). Any such disclosure plainly would

the very least, a "reasonable explanation" to support its claim of state secrets, but I would dismiss Zubaydah's discovery application at *Reynolds'* first step.[5]  For at least three reasons, Zubaydah has failed to prove any nontrivial need for his requested discovery.

First, Zubaydah will not use the requested discovery "in a case" that can offer him any meaningful relief.  *Reynolds*, 345 U. S., at 9.  While even the plaintiffs in *Reynolds* sought to exercise a federal right that potentially entitled them to damages, Zubaydah, by contrast, does not assert any federal right to relief.  He does not allege, for example, that the proposed discovery would support his release from federal custody.  Nor could he, as "the sought discovery will be shipped overseas for the benefit of another country's judicial system, and at that point, totally out of control of a domestic court." 965 F. 3d, at 792 (opinion of Bress, J.) (internal quotation marks omitted).  Instead, Zubaydah requests discovery on behalf of foreign authorities to help them prosecute foreign nationals who allegedly committed crimes in a foreign country.  At least for purposes of the state-secrets privilege, Zubaydah has no cognizable "need" to serve as a conduit for foreign discovery.  This Court has never held that an individual's desire to litigate a foreign case, let alone his desire merely to *assist* in the litigation of *someone else's* foreign case, establishes *any* need under *Reynolds*, dubious or otherwise.

Second, Zubaydah has failed to pursue "an available alternative" that "might have given [him] the evidence to

———————

have no significance.  The state-secrets privilege "belongs to the Government"—that is, our Government—alone. *United States* v. *Reynolds*, 345 U. S. 1, 7 (1953).

[5] I agree that dismissal is the appropriate disposition because "the privilege blocks Zubaydah's discovery requests, which are the proceeding's sole object." *Ante,* at 17 (plurality opinion).  But even in ordinary litigation, dismissal of the action is required whenever the case cannot be fairly litigated without the disclosure of state secrets.  See *Totten* v. *United States*, 92 U. S. 105, 107 (1876).

make out [his] case without forcing a showdown on the claim of privilege." *Reynolds*, 345 U. S., at 11. Before this Court, Zubaydah recognizes that his testimony as an alleged "survivor" of CIA interrogation could substitute for discovery from Mitchell and Jessen. Brief for Respondents 40. After all, what the Polish authorities supposedly "need to know is what happened inside Abu Zubaydah's cell between December 2002 and September 2003." Tr. of Oral Arg. 41. While Zubaydah complains that the Government holds him "*incommunicado*," he also admits that his attorneys may communicate on his behalf with the Government's "pre-clearance." Brief for Respondents 40. At oral argument, the Government confirmed that Zubaydah has never asked to offer testimony under this preclearance procedure, see Tr. of Oral Arg. 73, and the Government has since confirmed that the preclearance procedure remains available, see Letter Brief for United States 3. Faced with that confirmation, Zubaydah now concedes that "it is at least theoretically possible" that the preclearance process "will lead to a declaration that can assist the Polish prosecutor." Letter Brief for Respondents 2. He even asks that we hold his case in abeyance until he can prepare a declaration. See *ibid.* But that request comes too late. Zubaydah's "failure to pursue" an "available alternative" *before* demanding state secrets betrays "a dubious showing of necessity" that cannot overcome the Government's "formal claim of privilege." *Reynolds*, 345 U. S., at 11.

Third, on Zubaydah's own telling, it is "possible . . . to adduce the essential facts . . . without resort to material touching upon military secrets." *Ibid.* At oral argument, Zubaydah's counsel clarified that Zubaydah does not need evidence about Poland specifically and seeks discovery only regarding the conditions of his confinement while in CIA custody. See Tr. of Oral Arg. 41. Of course, that discovery would still tend to confirm or deny the existence of a detention site in Poland. See *ante,* at 17 (plurality opinion). But,

regardless, discovery is not warranted because Zubaydah effectively disclaims any need for such evidence. In his brief, Zubaydah claims already to have "abundant evidence" of his "detention and torture on Polish soil." Brief for Respondents 11. Similarly, at argument, Zubaydah's counsel represented that Polish authorities have "interviewed 62 people" and "amassed 43 volumes of documents." Tr. of Oral Arg. 44. His counsel further explained: "We're simply trying to supplement information" the Polish prosecutor "already has." *Id.,* at 66. In light of these admissions, it is clear that Zubaydah has already "adduce[d] the essential facts" that he believes are necessary to support the Polish prosecution. *Reynolds*, 345 U. S., at 11. His desire "simply . . . to supplement" a foreign investigation, Tr. of Oral Arg. 66, cannot establish the "immediat[e] and essentia[l]" need required to overcome the Government's formal invocation of the state-secrets privilege, *Burr*, 25 F. Cas., at 37.

\*  \*  \*

I would hold that Abu Zubaydah has demonstrated only "a dubious showing of necessity" for the discovery he seeks in this case. *Reynolds*, 345 U. S., at 11. For that reason alone, dismissal of Zubaydah's discovery application is required. I, therefore, join only Part IV of the Court's opinion.

# SUPREME COURT OF THE UNITED STATES

_____

No. 20–827

_____

## UNITED STATES, PETITIONER *v.* ZAYN AL-ABIDIN MUHAMMAD HUSAYN, AKA ABU ZUBAYDAH, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[March 3, 2022]

JUSTICE KAVANAUGH, with whom JUSTICE BARRETT joins, concurring in part.

I join all but Part II–B–2 of the Court's opinion. I add this brief concurrence simply to be clear about my understanding of how the "formula of compromise" articulated in *Reynolds* works in practice. *United States* v. *Reynolds*, 345 U. S. 1, 9 (1953).

For the state secrets privilege to apply, the relevant government agency head must first assert the privilege. The court must then determine that the "circumstances indicat[e] a reasonable possibility" that state secrets are involved. *Id.,* at 11. That threshold judicial inquiry is not demanding because, as our precedent and this case illustrate, those circumstances are typically self-evident when the Executive Branch asserts the state secrets privilege. See, *e.g., id.,* at 10; *Totten* v. *United States*, 92 U. S. 105, 106–107 (1876).

At that point, the court must accept the Executive Branch's assertion of privilege without further inquiry if the requester has shown only a "dubious" need for the requested information. *Reynolds*, 345 U. S., at 11. In many state secrets disputes, the case ends there—again, this case proves the point. See Part III, *ante*. If the requester has demonstrated a "strong" need for the information, the court

may under certain circumstances review the requested documents *in camera* to confirm that the information falls within the privilege. *Reynolds*, 345 U. S., at 10−11. To be clear, however, even if the requester has a strong need, a court should nonetheless not demand to examine the evidence—even "alone, in chambers"—if the Government can "satisfy the court, from all the circumstances of the case, that there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged." *Id.*, at 10; see also *id.*, at 11, n. 26 (noting that in *Totten*, "[t]he action was dismissed on the pleadings" because "it was so obvious" that "the very subject matter of the action, a contract to perform espionage, was a matter of state secret").

In all events, once the court determines that the requested information falls within the state secrets privilege, "even the most compelling necessity" cannot overcome the privilege. *Reynolds*, 345 U. S., at 11; see also *Totten*, 92 U. S. 105. The privilege is absolute, not qualified.

In state secrets cases, a court's review from start to finish must be deferential to the Executive Branch. As this Court has long explained, the courts "have traditionally shown the utmost deference to Presidential responsibilities" in cases involving "military or diplomatic secrets," *United States* v. *Nixon*, 418 U. S. 683, 710 (1974), and "have been reluctant to intrude upon the authority of the Executive in military and national security affairs," *Department of Navy* v. *Egan*, 484 U. S. 518, 530 (1988).

With that understanding of *Reynolds*, I join all but Part II–B–2 of the Court's opinion.

# SUPREME COURT OF THE UNITED STATES

———————

No. 20–827

———————

## UNITED STATES, PETITIONER *v.* ZAYN AL-ABIDIN MUHAMMAD HUSAYN, AKA ABU ZUBAYDAH, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[March 3, 2022]

JUSTICE KAGAN, concurring in part and dissenting in part.

Both sides have substantial interests in this case—the Government in safeguarding its relationships with foreign intelligence partners; Abu Zubaydah in obtaining information needed to right past wrongs. Sometimes, interests of that kind are wholly irreconcilable, and the state secrets privilege may then put an end to the suit. But that is not so here. The Government's national-security concerns all relate to confirming the location of detention sites. Zubaydah requests evidence of a broader scope, concerning not just where he was detained, but also what happened there. The District Court, using established methods, can segregate the two kinds of evidence—protecting classified information about location while giving Zubaydah access to unclassified information about detention conditions and interrogation methods. I would remand the case to allow that process to go forward. So although I join the Court in much of its analysis, I respectfully dissent from its decision to dismiss this suit.

Start with where I join the Court: I agree the Government has met its burden of showing that testimony by former CIA contractors confirming the location of Zubaydah's detention would pose a "reasonable danger" of harm to national security. *United States* v. *Reynolds*, 345 U. S. 1, 10 (1953); see

*ante*, at 10–15.  That is true for two reasons.  First, testimony of that kind would remove whatever "element of doubt" exists about the accuracy of public reporting on the detention site's location, potentially undermining other CIA activities in that country.  App. to Pet. for Cert. 135a (Decl. of Michael Pompeo, Director, CIA).  Second (and possibly more important here), official confirmation would conflict with commitments the Government has made to foreign intelligence services to never disclose clandestine relationships—even as "time passes" and "new political parties or officials come to power" or "media leaks occur." *Id.*, at 136a.  Standing by those commitments, the Government credibly states, is "critical" to preserving current intelligence partnerships and establishing new ones.  *Id.*, at 132a; see *id.,* at 136a; *ante,* at 10–12.  Those concerns explain why the Government has refused, across three Presidential administrations, to confirm or deny reports about the foreign countries involved in the CIA's "former detention and interrogation program."  App. to Pet. for Cert. 133a; see Tr. of Oral Arg. 25.  The Court is right to respect that decision, and thus to deny Zubaydah's request for the location of his detention.

But that does not mean, as the Court insists, that we should dismiss Zubaydah's suit.  From the beginning of this litigation, Zubaydah has distinguished between the "where" and the "what"—the location of the detention site at issue and the treatment he received there.  See, *e.g.*, App. to Pet. for Cert. 42a (District Court Order).  And in this Court, his attorney made clear that Zubaydah's primary interest is in obtaining information on the latter subject.  He wants the CIA contractors to testify about "what happened inside [his] cell" during a particular 10-month period, irrespective of where that cell may have been.  Tr. of Oral Arg. 41; see *ibid.* ("I'm not planning to ask did it happen in Poland. . . . I want to ask simple questions like, how was Abu Zubaydah fed?  What was his medical condition?  What was his cell like?  And, yes, was he tortured?").  For its part, the

Government concedes that information about Zubaydah's treatment is no longer classified: It is, on any understanding, not a state secret. See Tr. of Oral Arg. 6 (explaining that the Government in 2014 "decided to declassify" information about "the treatment of detainees" like Zubaydah "to facilitate public scrutiny of the United States' actions"). That creates the possibility of segregating the classified (location) information from the unclassified (treatment) information and allowing discovery into the latter.

That kind of segregation has happened before, showing what could be done in this case. In 2014, the Senate Select Committee on Intelligence released a nearly 700-page Report, describing the CIA's torture of various detainees—all while using code words like "Detention Site Green" and "Detention Site Blue" to designate particular facilities. See S. Rep. No. 113–288 (2014) (Senate Report). More recently, the CIA permitted its former contractors to testify, in civil litigation and Military Commission hearings, about their use of "enhanced interrogation techniques" on detainees— again without disclosing any locations. See, *e.g.,* Stipulation Regarding Discovery in *Salim* v. *Mitchell*, No. 2:15–cv– 286 (ED Wash.), ECF Doc. 47, pp. 5, 7–8. Both the Senate Report and the contractors' testimony discuss Zubaydah, explaining how he was tortured at the first facility he was brought to (whose location has also been identified in public reporting). See, *e.g.*, Senate Report, at 17–48, 231, n. 1316 (describing, among other interrogation methods, more than 80 waterboardings); see also *post*, at 4–5 (GORSUCH, J., dissenting). But neither source details what happened to Zubaydah at the site here in question, the second facility at which he was detained. What Zubaydah now mainly wants is to fill that gap. He is requesting the same information about the second facility as he already has about the first: the contractors' testimony about the treatment he received there, scrubbed of any reference to where it occurred. So the procedures that worked before—to protect the classified

while disclosing the unclassified—can work again. And this case can go forward on that basis.

The Court offers no satisfactory explanation for rejecting that approach. It says that segregation cannot succeed because of "the specific language of Zubaydah's discovery requests"—twelve of which "contain the word 'Poland' or 'Polish.'" *Ante*, at 9; see *ante*, at 16–17. That is fair enough, so far as it goes: Responses to the requests as currently written would, as the Court says, "either confirm or deny" that Poland hosted a CIA-operated detention site. *Ante*, at 9. But a problem of phrasing can be solved by rephrasing. Zubaydah has long made clear—not just in this Court but also below—that he would modify his requests if that would make a difference. See, *e.g.*, Tr. of Oral Arg. 41–44, 49–50; App. to Pet. for Cert. 42a. All that now needs to happen is for this Court to say that it would. Then Zubaydah would excise any country name from his discovery requests; and the contractors would answer those requests as they previously have done—by describing his treatment at a detention site, without divulging where that site was. Even the Court admits that possibility, though in a backhanded way. The Court says it "do[es] not here decide whether" Zubaydah could obtain location-cleansed testimony by filing a new suit containing narrowed discovery requests. *Ante*, at 17. But the question of segregation can be decided now, and in this suit, rather than by sending Zubaydah back to square one. See also *post*, at 29–30 (GORSUCH, J., dissenting). I would allow Zubaydah to amend his requests to remove all Poland-specific references, so that he can obtain testimony about his detention—in whatever country it took place.

In short, the holding that national-security risks attach to confirming the location of Zubaydah's detention—with which I agree—should not end this case. A court can segregate that classified information from unclassified material about the nature of Zubaydah's detention. I would remand

the case for that to occur, thus protecting not only the
United States's security interests but also Zubaydah's in-
terest in forcing disclosure of government abuse.

# SUPREME COURT OF THE UNITED STATES

_____

No. 20–827

_____

UNITED STATES, PETITIONER *v.* ZAYN AL-ABIDIN MUHAMMAD HUSAYN, AKA ABU ZUBAYDAH, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[March 3, 2022]

JUSTICE GORSUCH, with whom JUSTICE SOTOMAYOR joins, dissenting.

There comes a point where we should not be ignorant as judges of what we know to be true as citizens. See *Watts* v. *Indiana*, 338 U. S. 49, 52 (1949). This case takes us well past that point. Zubaydah seeks information about his torture at the hands of the CIA. The events in question took place two decades ago. They have long been declassified. Official reports have been published, books written, and movies made about them. Still, the government seeks to have this suit dismissed on the ground it implicates a state secret—and today the Court acquiesces in that request. Ending this suit may shield the government from some further modest measure of embarrassment. But respectfully, we should not pretend it will safeguard any secret.

## I
## A

Start with what the government itself has said about Zubaydah. In 2014, a Select Committee of the United States Senate published a 683-page report about the CIA's detention and interrogation practices. The report did not focus on Zubaydah alone, but it included certain details about his treatment, including the following. After his cap-

ture in Pakistan in March 2002, the government transported him to a "black site" known as Detention Site Green. See S. Rep. No. 113–288, pp. 21–23 (2014) (Senate Report).[1] At that time, CIA officials thought Zubaydah might have been the "third or fourth man" in al Qaeda and withholding information about the September 11 attacks and potential future assaults. *Id.*, at 410–411 (internal quotation marks omitted).

In an effort to extract that information, the CIA hired two contractors, James Mitchell and John Jessen, and authorized them to employ what it called "enhanced interrogation techniques." Brief for United States 3. Mitchell and Jessen worked "on a near 24-hour-per-day basis" starting August 4, 2002. Senate Report 40; see also *id.*, at 35, 42.[2] They waterboarded Zubaydah at least 80 times, simulated live burials in coffins for hundreds of hours, and performed rectal exams designed to establish "total control over the detainee." *Id.*, at 42–43, 82, 231, n. 1316, 488, 495 (internal quotation marks omitted). Six days into his ordeal, Zubaydah was sobbing, twitching, and hyperventilating. *Id.*, at 41, 43, 111–112. During one waterboarding session, Zubaydah became "completely unresponsive, with bubbles rising through his open, full mouth." *Id.*, at 43–44 (internal quotation marks omitted). He became so compliant that he would prepare for waterboarding at the snap of a finger. *Id.*, at 43.

By this point, Mitchell and Jessen concluded that it was "'highly unlikely' that Zubaydah possessed the information

——————
[1] Although the government has not confirmed it, published reports have placed Detention Site Green in Thailand. See, *e.g.*, S. Bengali & C. Megerian, The CIA Closed Its Original 'Black Site' Years Ago, L. A. Times, Apr. 22, 2018, https://www.latimes.com/world/asia/la-fg-thailand-cia-haspel-2018-htmlstory.html.

[2] In the Senate Report, Mitchell and Jessen are code-named Swigert and Dunbar. See, *e.g.*, Senate Report 21. Mitchell and Jessen later admitted their roles in the CIA's enhanced interrogation program. See *Husayn* v. *Mitchell*, 938 F. 3d 1123, 1127, n. 4 (CA9 2019).

they were seeking," and they sought to end the interrogations. *Id.*, at 42. It seems their assessment may have been correct. Although Zubaydah's relationship with al Qaeda remains the subject of debate today, the authors of the Senate Report found that the CIA's records "do not support" the suggestion that he was involved in the September 11 attacks. *Id.*, at 410. At the time, however, CIA headquarters was not yet persuaded by Mitchell's and Jessen's report. It instructed the pair to continue their work. *Id.*, at 43. Following these directions, Mitchell and Jessen carried on for two more weeks until their superiors finally concluded that Zubaydah "did not possess any new terrorist threat information." *Id.*, at 40, 45.

In December 2002, the government moved Zubaydah to another black site, this one known as Detention Site Blue. *Id.*, at 67. After a stay there and, it seems, years of further transfers among other black sites, Zubaydah was transferred to the government's detention center in Guantánamo Bay in 2006. Brief for United States 2. More than 15 years later, he remains there still. *Ibid.*

B

The Senate Report is only the start of what we know. As far back as 2007, the Council of Europe issued a lengthy report finding that the CIA held Zubaydah at a black site in Poland after his capture.[3] In 2012, Aleksander Kwasniewski, the President of Poland from 1995 to 2005, told reporters that the CIA site was established "with [his] knowledge."[4] In 2014, the European Court of Human Rights found "beyond reasonable doubt" that Zubaydah was

————————
[3] See D. Marty, Secret Detentions and Illegal Transfers of Detainees Involving Council of Europe Member States: Second Report, Council of Europe Parliamentary Assembly Committee on Legal Affairs and Human Rights ¶¶ 70, 127 (2007).

[4] *Husayn (Abu Zubaydah)* v. *Poland*, no. 7511/13, ¶234, ECHR 2014 (internal quotation marks omitted).

detained in Poland from December 2002 until September 2003.[5] In support of its conclusion, the ECHR cited evidence spanning over 100 pages, including declassified flight records, Polish governmental records, and eyewitness testimony. Many other public sources have likewise documented that Zubaydah was transported from Detention Site Green to Detention Site Blue in Poland in December 2002—and that he remained there until September 2003.[6]

We know even more from Mitchell and Jessen themselves. The pair have spoken and written extensively—without governmental objection—about their activities. In 2016, the CIA permitted Mitchell to publish a book. *Enhanced Interrogation* is available on Amazon from $13.99, where it is touted as "lift[ing] the curtain" on the CIA's interrogation program, including "its methods, and its downfall."[7] In 2017, as part of a lawsuit brought by other former CIA detainees, the government allowed Mitchell and Jessen to testify how they conceived the idea of waterboarding detainees, how they asked the CIA to discontinue the use of enhanced interrogation techniques with Zubaydah, and how headquarters refused. See Stipulation Regarding Discovery in *Salim* v. *Mitchell*, No. 2:15–cv–286 (ED Wash. 2015), ECF Doc. 47; Brief for Respondents 7–8. In 2020, the pair testified with governmental permission once more, this time in military commission hearings at Guantánamo Bay. Over eight days, covering 2,000 pages of testimony, Mitchell explained how Zubaydah was waterboarded and kept awake for 126 consecutive hours, along with other details

---

[5] See *id*., ¶¶ 404–529.

[6] See, *e.g.*, Brief for Bureau of Investigative Journalism et al. as *Amici Curiae* 11–43 (citing examples).

[7] See J. Mitchell & B. Harlow, Enhanced Interrogation: Inside the Minds and Motives of the Islamic Terrorists Trying To Destroy America (online source archived at www.supremecourt.gov).

about the CIA's techniques.[8]  Jessen provided similar testimony.[9]  In 2021, Mitchell even appeared in an HBO documentary about his activities and treatment of Zubaydah. See The Forever Prisoner (2021).

### C

Still, Zubaydah's story remains incomplete.  While we know that the CIA held Zubaydah at Detention Site Blue from December 2002 until September 2003, and while we know that the site was in Poland, what happened to him there remains unclear.  The Senate Report explains that he was tortured immediately before that period, during his time at Detention Site Green.  Senate Report 208, n. 1207. The Senate Report also recounts how Mitchell and Jessen tortured *other* detainees at Detention Site Blue, including details about how they waterboarded one detainee 183 times over two weeks.  *Id.*, at 65–72, 77–93, 101, 103, 268. But, Zubaydah's lawyers tell us, the details of Zubaydah's treatment during this singular period are not yet publicly documented.

Today, Polish prosecutors are seeking to unravel that part of the story and determine whether criminal charges are appropriate in that country.  Pursuant to 28 U. S. C. §1782, Zubaydah's attorneys filed this domestic lawsuit to obtain discovery from Mitchell and Jessen to assist the Polish investigation.  Section 1782 allows suits of just this kind:  It provides that federal courts may order persons in this country to give testimony or produce documents "for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation."

---

[8] See Tr. in *United States* v. *Khalid Shaikh Mohammad*, pp. 30348–30349 (Jan. 21, 2020); *id.*, at 30441–30443, 30469 (Jan. 22, 2020 (morning)).

[9] See, *e.g.*, *id.*, at 32450–32467 (Jan. 31, 2020).

Early in the litigation, Zubaydah's lawyers issued sub-
poenas to Mitchell and Jessen seeking their depositions and
the production of documents. See Appendix, *ante*, at 19–20.
Essentially, the requests fell into three main categories.
Zubaydah's lawyers sought: (1) information to confirm that
Detention Site Blue was located in Poland; (2) details about
Zubaydah's interrogation, his treatment, and his conditions
of confinement; and (3) information about the involvement
of Polish officials.

The government filed a motion seeking to have the peti-
tion for discovery dismissed in its entirety. In support, the
government supplied a declaration from then-CIA Director
Mike Pompeo. The declaration conceded that "the en-
hanced interrogation techniques employed with respect to
specific detainees in the program, and their conditions of
confinement, are no longer classified." App. to Pet. for Cert.
143a; *id.*, at 153a. At the same time, the declaration as-
serted that the location of Detention Site Blue remained a
state secret. And the declaration averred that soliciting in-
formation about the involvement of Polish nationals could
complicate national security. *Ibid.*

In response, Zubaydah's lawyers sought an accommoda-
tion. While they continued to pursue all of their requested
discovery, they also acknowledged the District Court's
power to modify or limit their discovery requests. *Id.*, at
42a. And they stressed that "[v]aluable discovery may pro-
ceed without requiring [Mitchell and Jessen] to confirm ei-
ther the location of any particular site, or the cooperation of
any particular government." *Ibid.* (internal quotation
marks omitted). Zubaydah's lawyers noted, too, that the
government had previously allowed Mitchell and Jessen to
testify about their activities at other detention sites using
code names, and they offered to follow the same protocol
here. *Ibid.*

In the end, however, the District Court granted the gov-
ernment's motion to dismiss. In doing so, the court rejected

the government's suggestion that its detention site in Po-
land remained a state secret. The court concluded the state
secrets privilege did not apply because of how much atten-
tion the site had received over the years and the govern-
ment's failure to explain how acknowledging the site would
cause further harm. *Id.*, at 52a–53a, 59a. Still, the court
expressed concern that if Mitchell and Jessen exposed the
names of Polish officials and their roles at the site, it could
complicate national security in light of the government's
declaration. *Id.*, at 59a.

   On appeal, the Ninth Circuit affirmed in part and re-
versed in part. With respect to the third category of infor-
mation Zubaydah sought, concerning the involvement of
Polish nationals, the Court of Appeals agreed with the Dis-
trict Court and the government. Discovery into "the identi-
ties and roles of foreign individuals involved with the de-
tention facility, operational details about the facility, and
any contracts made with Polish government officials or pri-
vate persons residing in Poland might implicate the CIA's
intelligence gathering efforts." *Husayn* v. *Mitchell*, 938
F. 3d 1123, 1134 (CA9 2019).

   At the same time, the Ninth Circuit held that the District
Court erred by refusing discovery into the first and second
categories of information Zubaydah sought. With respect
to the first, the Court of Appeals pointed to the District
Court's finding that the CIA's detention facility in Poland
was widely known and did not qualify as a state secret.
*Ibid.* Given that finding, the Court of Appeals concluded,
Zubaydah was entitled to discovery about the site's location.
*Ibid.* With respect to the second category, the Court of Ap-
peals held that "information about the use of interrogation
techniques," "conditions of confinement," and the "details of
Abu Zubaydah's treatment" could be provided without risk
to any state secret. *Ibid.* The court stressed that Mitchell
and Jessen had already provided similar information about
Zubaydah's treatment at other locations in past cases using

code names; it saw no reason why the same course could not be followed here. *Id.*, at 1137. The Court of Appeals faulted the District Court for failing to disaggregate or limit the scope of Zubaydah's requests before dismissing them all. *Id.*, at 1136–1137.

D

Dissatisfied with its partial victory before the Ninth Circuit, the government seeks further relief in this Court. But as it comes to us, the parties' dispute is limited. Zubaydah does not appeal the Ninth Circuit's decision. So while the majority (repeatedly) emphasizes the breadth of his initial discovery requests, *ante*, at 5, 9, that is beside the point. No one argues that Zubaydah may pursue the third category of information he initially sought—including the identities and roles of foreign individuals involved with the detention facility.

Even when it comes to the two remaining categories of information at issue—the location of the government's detention site and the CIA's treatment of Zubaydah there—the parties' dispute has narrowed substantially. The District Court found that the site's location did not implicate a state secret, and the Court of Appeals agreed. The government asserts this decision was mistaken, while Zubaydah's lawyers defend it. But, as they have throughout the litigation, Zubaydah's lawyers also offer an alternative. Before the District Court, they stressed that "[v]aluable discovery" could proceed into Zubaydah's interrogations, treatment, and conditions of confinement without requiring Mitchell and Jessen to confirm "the location of any particular site or the cooperation" of foreign nationals. App. to Pet. for Cert. 42a (internal quotation marks omitted). Before this Court, they stress the same point. See Tr. of Oral Arg. 41.

As it arrives before us, then, the central question in this case concerns the request for information about "what happened inside Abu Zubaydah's cell between December 2002

and September 2003." *Ibid.* It is this information—about Zubaydah's interrogation, treatment, and conditions of confinement at the hands of the CIA—that Zubaydah's lawyers say they need most. Nor does anyone suggest this request implicates a state secret. The government does not (and cannot) claim that its custody of Zubaydah at a black site remains a state secret: That much was declassified and documented in the Senate Report years ago. See, *e.g.*, Senate Report 67. The government has conceded, too, that the interrogation techniques Mitchell and Jessen employed and Zubaydah's conditions of confinement and treatment within his cell during that period are "no longer classified." App. to Pet. for Cert. 143a; *id.*, at 153a. At a minimum, Zubaydah's lawyers argue, all this means he should be allowed discovery from Mitchell and Jessen about his interrogations, treatment, and conditions of confinement from December 2002 until September 2003, with safeguards to protect against the disclosure of the site's location and the involvement of foreign nationals.

This request is not a novel one. As Zubaydah's attorneys observe, the Senate Report discussed the treatment of detainees at various sites during specific time periods while referring to those locations by code name—Green, Cobalt, Blue. See, *e.g.*, Senate Report 99–108 (referencing torture of various detainees at Detention Site Cobalt). In extensive civil litigation preceding this suit, Mitchell and Jessen testified using the same practice—speaking about the treatment of detainees during specific periods while using code names where appropriate. Stipulation Regarding Discovery in *Salim* v. *Mitchell*, No. 2:15–cv–286. The military commissions where the government allowed Mitchell and Jessen to appear employed the same procedure too. See, *e.g.*, Tr. in *United States* v. *Khalid Shaikh Mohammad*, p. 31371, pt. 4 (Jan. 27, 2020).

Despite all this, the government asks us to dismiss this lawsuit. What worked before, the government submits,

cannot work again. Unlike previous lawsuits, this one alone must be dismissed at its outset. And, the government insists, this Court owes "utmost deference" to its demand. Brief for United States 19 (internal quotation marks omitted).

## II
## A

I do not question that Article II grants the Executive substantial authority over the conduct of the Nation's foreign affairs. Cf. *Nestle USA, Inc.* v. *Doe*, 593 U. S. ___, ___–___ (2021) (GORSUCH, J., concurring) (slip op., at 5–6). Nor do I doubt that the Executive's responsibility in this field often "poses 'delicate' and 'complex' questions involving 'large elements of prophecy . . . for which the Judiciary has neither aptitude, facilities nor responsibility.'" *Id.*, at ___ (slip op., at 6) (quoting *Chicago & Southern Air Lines, Inc.* v. *Waterman S. S. Corp.*, 333 U. S. 103, 111 (1948) (Jackson, J.)).

At the same time, in this arena as in many others, the Constitution sometimes envisions a degree of interdependence between the branches of our government. So, for example, while the Executive bears many responsibilities over foreign affairs, Congress alone possesses the power to raise armies, maintain a navy, declare war, and fund foreign expeditions. Art. I, §8. Also, Congress enjoys substantial power when it comes to regulating the jurisdiction of the federal courts—a power it has employed from time to time to authorize judges to entertain cases and controversies implicating foreign affairs. See, *e.g.*, Judiciary Act of 1789, §9, 1 Stat. 77; Trafficking Victims Protection Reauthorization Act of 2003, §4(a)(4)(A), 117 Stat. 2878.

Our case is such a case. In §1782, Congress has expressly authorized federal courts to order discovery from domestic persons in aid of foreign proceedings like the ongoing Polish prosecution. No one suggests that, on its face and in all its

applications, §1782 intrudes on powers vested in the Executive alone. Normally, too, when Congress endows the Judiciary with the statutory authority to decide a case, we have a "virtually unflagging" obligation to do just that. *Colorado River Water Conservation Dist.* v. *United States*, 424 U. S. 800, 817 (1976). In deciding cases lawfully put to us, courts generally must respect as well the ancient rule that the public enjoys a right to "every man's evidence." 4 J. Wigmore, Evidence in Trials at Common Law §2192, p. 2965 (1905). In this country, no one stands above the law; not even the President may deflect evidentiary inquiries just because they may prove inconvenient or embarrassing. See *Trump* v. *Vance*, 591 U. S. \_\_\_, \_\_\_–\_\_\_ (2020) (slip op., at 14–15); *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 646 (1952) (Jackson, J., concurring) ("No penance would ever expiate the sin against free government of holding that a President can escape control of executive powers by law through assuming his military role").

None of this is to suggest that the state secrets privilege is inconsistent with our separation of powers. Even a statute that constitutionally allows federal courts to pass on matters touching on foreign affairs in most cases may, in some applications, trench on powers the Constitution reserves for the Executive. It is simply that the privilege is no blunderbuss and courts may not flee from the field at its mere display. Instead, when the Executive seeks to withhold every man's evidence from a judicial proceeding thanks to the powers it enjoys under Article II, that claim must be carefully assessed against the competing powers Articles I and III have vested in Congress and the Judiciary. The original design of the Constitution and "our historic commitment to the rule of law" demand no less. *United States* v. *Nixon*, 418 U. S. 683, 708 (1974).[10]

---

[10] The majority invokes *Department of Navy* v. *Egan* for the proposition

B

The Constitution's insistence on this point is clear from our history. Today, the Executive demands "utmost deference" to its judgment that Zubaydah's suit should be dismissed. Brief for United States 19 (internal quotation marks omitted). But over 200 years ago, an attorney for the United States acting on behalf of President Jefferson pursued a similar line, insisting on the President's right to withhold evidence that "might contain state secrets" from the trial of Aaron Burr. *United States* v. *Burr*, 25 F. Cas. 30, 31 (No. 14,692d) (CC Va. 1807). And Chief Justice Marshall expressly refused to afford that kind of latitude.

To be sure, under English law the King could "do no wrong," he could not "be named in debate," and he enjoyed largely unfettered discretion to withhold evidence from legal proceedings. See *id.*, at 34. But, Chief Justice Marshall explained, such rules have no place in our Republic given that "many points of difference . . . exist between the first magistrate in England and the first magistrate of the United States." *Ibid.* Instead, if the President wishes to withhold evidence from a lawfully authorized judicial proceeding he must at least "state the particular reasons" for his action. *United States* v. *Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807). And while the Judiciary should pay "all proper respect" to those reasons, as an independent branch of government it must decide for itself whether to sustain a claim of privilege in its proceedings, bearing in mind that it is a "very serious thing" to allow any party to withhold relevant evidence. *Ibid.*

───────────

that we should be "'reluctan[t] to intrude upon the authority of the Executive in military and national security affairs.'" *Ante*, at 8 (quoting 484 U. S. 518, 530 (1988)). But the majority omits an important caveat found in the same sentence it quotes: "unless Congress specifically has provided otherwise." *Egan*, 484 U. S., at 530. Because Congress has expressly authorized the Judiciary to entertain this suit, it follows that we may not reflexively defer to the Executive's wish to see it dismissed.

Had Chief Justice Marshall envisioned a rule of "utmost deference" to executive claims of privilege replicating something like the privilege the English crown enjoyed, it would have been the simplest thing for him to say so. Instead, the "clear implication" of his opinions in *Burr* is that "the President's special interests may warrant a careful judicial screening of subpoenas after the President interposes an objection, but that some subpoenas will nevertheless be properly sustained by judicial orders of compliance." *Nixon* v. *Sirica*, 487 F. 2d 700, 710 (CADC 1973). And "the ultimate decision" on such matters "remain[s]" with a court of law. *Ibid.*; see also *Vance*, 591 U. S., at \_\_\_ (slip op., at 7).[11]

Almost 150 years after *Burr*, the Court reaffirmed this same understanding in *United States* v. *Reynolds*, 345 U. S. 1 (1953). There, executive officials once more sought something like "utmost deference" to their claim that evidence

—————

[11] JUSTICE THOMAS observes that President Jefferson did not seek to withhold evidence on state secrets grounds. *Ante*, at 12. That much is true. A government attorney invoked the privilege on the President's behalf, relying on a "communication from the president." See *Burr*, 25 F. Cas., at 191. And Chief Justice Marshall—perhaps wary of ascribing the attorney's arguments to the President—expressed some concern on this score. See *id.*, at 192. But as this Court has recounted, President Jefferson was anything but ignorant of the proceedings and had raised privilege concerns in a letter to the attorney. See *Vance*, 591 U. S., at \_\_\_–\_\_\_ (slip op., at 5–7). Nor, in any event, is it clear what difference this makes: As JUSTICE THOMAS acknowledges, the Chief Justice discussed how the state secrets privilege would operate if and when the President chose to submit "particular reasons" for withholding evidence. *Burr*, 25 F. Cas., at 192; see *ante*, at 12. JUSTICE THOMAS stresses that, in the course of this discussion, Chief Justice Marshall acknowledged that the President "may" rather than "must" state his particular reasons for seeking to withhold evidence. *Ante*, at 13. But Chief Justice Marshall nowhere suggested that the state secrets privilege should apply in this country without such a statement. See *Vance*, 591 U. S., at \_\_\_ (slip op., at 7). Nor did he guarantee that producing such a statement would automatically spell the end of the judicial inquiry, as JUSTICE THOMAS seems to suppose. See *Burr*, 25 F. Cas., at 192; *Vance*, 591 U. S., at \_\_\_ (slip op., at 7).

should be suppressed from judicial proceedings in the name of national security. *Id.*, at 6. And once more the Court refused to indulge that view. In England, Kings may have enjoyed the kind of latitude the government sought. *Id.*, at 7 (citing *Duncan* v. *Cammell, Laird & Co.*, [1942] A. C. 624). But under our Constitution, *Reynolds* emphasized, the Executive may not judge its own case: "Judicial control over the evidence in a case cannot be abdicated to the caprice of executive officers." 345 U. S., at 9–10.

In this particular, our Nation broke from English practice. The Declaration of Independence did not endorse crown prerogatives but described many as evils. The Constitution did not create a President in the King's image but envisioned an executive regularly checked and balanced by other authorities. Our Founders knew from hard experience the "intolerable abuses" that flow from unchecked executive power. *Id.*, at 8; see also *Youngstown*, 343 U. S., at 641 (Jackson, J., concurring).

Nor is their experience an alien one. More recent history reveals that executive officials can sometimes be tempted to misuse claims of national security to shroud major abuses and even ordinary negligence from public view. In *Korematsu* v. *United States*, the President persuaded this Court to permit the forced internment of Japanese-American citizens during World War II. 323 U. S. 214 (1944). The President did so in part by relying on a military report that insisted immediate action was imperative to national security. *Id.*, at 235–236 (Murphy, J., dissenting). The report, however, contained information executive officials knew to be false at the time. Yet it took decades before the government publicly acknowledged its misrepresentation to this Court. See Dept. of Justice, Archives, N. Katyal, Confessions of Error: The Solicitor General's Mistakes During the Japanese-American Internment Cases (May 20, 2011). And still more years passed before this Court formally repudiated its decision. See *Trump* v. *Hawaii*, 585

U. S. \_\_\_, \_\_\_ (2018) (slip op., at 38).

In *Reynolds*, a similar story unfolded. There, families of civilians killed in the crash of an Air Force plane sued the government for negligence and sought its official accident report. The government invoked the state secrets privilege and filed a declaration asking courts to shield the document from disclosure. In response, this Court refused to afford the government utmost deference but ultimately allowed it to withhold the report. The Court did so without even pausing to review the report independently in chambers or asking a lower court to take up that task. See *Reynolds*, 345 U. S., at 10–11. Decades later, when the government released the report, it turned out to contain no state secrets—only convincing proof of governmental negligence. See J. Weinstein, The Role of Judges in a Government of, by, and for the People: Notes for the Fifty-Eighth Cardozo Lecture, 30 Cardozo L. Rev. 1, 92 (2008). So it seems that, in the very case where this Court stressed the importance of carefully examining claims of privilege, families were denied access to proof to which they were lawfully entitled only because this Court accepted the Executive's declaration at face value.

More recent history bears its cautions too. The government invoked the state secrets privilege only 16 times between 1961 and 1980. See Brief for Public Citizen as *Amicus Curiae* 9. Yet it has done so at least 49 times between 2001 and 2021. See *id.*, at 9–10. What is more, the propriety of several of these assertions has been called into question. *Id.*, at 10–17 (collecting examples); see also *id.*, at 21–24 (documenting alleged improper governmental withholding of information in FOIA cases); W. Weaver & R. Pallitto, State Secrets and Executive Power, 120 Pol. Sci. Q. 85, 101, 107–112 (2005) (Weaver & Pallitto).

For decades, public servants ranging from Erwin Griswold to Donald Rumsfeld and Porter Goss have complained about overclassification by the Executive Branch. See, *e.g.*,

Brief for Public Citizen as *Amicus Curiae* 17–19.  Officials
who have served in the Executive Branch have estimated
that between 50% and 90% of classified material does not
merit that treatment.  *Id.*, at 19–20.  In 1996, the federal
government made about 5.8 million classification decisions;
by 2017, that number reached approximately 49 million.
Compare Nat. Archives and Records Admin., Information
Security Oversight Office, 2010 Report to the President 12,
with Nat. Archives and Records Admin., Information Secu-
rity Oversight Office, 2017 Report to the President 1–2.  It
seems the government once even classified a memo from
one member of the Joint Chiefs of Staff to another discuss-
ing how too many documents were being classified.  Weaver
& Pallitto 87.

It may be understandable that those most responsible for
the Nation's security will seek to press every tool available
to them to maximum advantage.  There has always been
something of a "hydraulic pressure inherent within each of
the separate Branches" to test "the outer limits of its
power."  *INS* v. *Chadha,* 462 U. S. 919, 951 (1983).  It may
be nothing less than human nature.  But when classifica-
tion standards are "so broadly drawn and loosely adminis-
tered," temptation enough exists for executive officials to
"cover up their own mistakes and even their wrongdoing
under the guise of protecting national security."  K. Mayer,
With the Stroke of a Pen: Executive Orders and Presiden-
tial Power 145 (2001) (internal quotation marks omitted).
This Court hardly needs to add fuel to that fire by abdicat-
ing any pretense of an independent judicial inquiry into the
propriety of a claim of privilege and extending instead "ut-
most deference" to the Executive's mere assertion of one.
Walking that path would only invite more claims of secrecy
in more doubtful circumstances—and facilitate the loss of

liberty and due process history shows very often follows.[12]

## C

Accepting that independent judgment is required of us in cases like this one, how exactly should we proceed? If the government's "utmost deference" test is not appropriate, what rules are? Our precedents offer a number of lessons.

First, *Reynolds* held that, when the Executive seeks to withhold evidence from a congressionally authorized judicial proceeding, it must show a "reasonable danger" of harm to national security would follow otherwise. 345 U. S., at 10. To be sure, most parties who seek to invoke an evidentiary privilege bear the burden of showing their entitlement to do so by a preponderance of proof. See, *e.g.*, 1 C. Mueller & T. Kirkpatrick, Federal Evidence §1:32, pp. 213–214 (4th ed. Supp. 2021). And here the government's burden is a good deal more forgiving. But I can also see why. The line *Reynolds* drew seeks to accommodate the separation of powers: It ensures that a congressional mandate to entertain a case or controversy will not be automatically frustrated. It guarantees a degree of independent judicial

---

[12] In defending the government's proposed "utmost deference" standard, JUSTICE THOMAS stresses that the duty to produce every man's evidence "is not insisted upon" when a privilege applies. *Ante,* at 11 (internal quotation marks omitted). He also highlights that §1782 does not compel individuals to provide evidence when doing so would "violat[e]" a "legally applicable privilege." *Ibid.* (internal quotation marks omitted). But neither of these truisms answers the question *when* the state secrets privilege applies—let alone proves that a court should afford "utmost deference" to the mere assertion of a privilege. The truth is, privileges against the production of evidence apply "only where necessary to achieve [their] purpose" given that they have the "effect of withholding relevant evidence from the fact-finder." *Fisher* v. *United States*, 425 U. S. 391, 403 (1976). And it is a "fundamental maxim" that "any exemptions which may exist to [the general rule favoring disclosure] are distinctly exceptional," and therefore "all privileges of exemption . . . should be recognized only within the narrowest limits defined by principle." J. Wigmore, Evidence §2192, pp. 64, 67 (3d ed. 1940).

review. Yet it also seeks to respect the Executive's specially assigned constitutional responsibilities in the field of foreign affairs and the delicate and complex predictive judgments the Executive often must make there.

Second, when assessing a state secrets claim courts may—and often should—review the evidence supporting the government's claim of privilege *in camera*. *Reynolds* said that "[w]hen" the government can show a reasonable danger of harm exists by means of a declaration, a "court should not . . . insis[t] upon an examination of the evidence, even by the judge alone, in chambers." 345 U. S., at 8, 10. But at the same time, the Court *also* stressed that, before excluding evidence, a judge "must be satisfied" that a reasonable danger of harm would flow from its production— and that this is a responsibility no court may "abdicat[e]." *Id.*, at 9–10. From this, it follows that in cases of doubt more careful scrutiny is required before a court may uphold a claim of privilege.

It is at this point, too, where the magnitude of a party's need for the requested evidence may become relevant. *Reynolds* explained that the extent of a party's need for the government's evidence can inform "how far the court should probe in satisfying itself that the occasion for invoking the privilege is appropriate." *Id.*, at 11. But *Reynolds* did not create a threshold inquiry requiring a litigant to demonstrate its need for relevant evidence before the government must show a reasonable danger of harm would flow from its production. Today's majority recognizes this point, explaining that "only after satisfying itself that the Government has offered a valid reason for invoking the privilege would a court turn to the issue of necessity." *Ante*, at 12 (citing *Reynolds*, 345 U. S., at 10–11).

Here again, I see a balance consistent with the Constitution's design. A court persuaded that the government has met its burden by declaration may find the privilege properly invoked. But a court harboring questions must

probe further and examine the bases for the government's assertions *in camera*. Nor may a court allow the government to deny access to every man's evidence unless and until it establishes its lawful entitlement to do so. This Court has endorsed a similar procedure for resolving claims of executive privilege in other contexts. See, *e.g.*, *Nixon*, 418 U. S., at 713–715, and n. 21. Congress has authorized parallel procedures in several statutes implicating national security information. See, *e.g.*, Foreign Intelligence Surveillance Act of 1978, 92 Stat. 1785, as amended, 50 U. S. C. §1806(f ); Classified Information Procedures Act, 18 U. S. C. App. §4, p. 414. And courts routinely test claims of entitlement to other ancient and venerable privileges in just this way. See, *e.g.*, *United States* v. *Zolin*, 491 U. S. 554, 556 (1989) (holding that *in camera* review may be used to probe crime-fraud challenges to attorney-client privilege); see also n. 12, *supra* (observing that privileges generally "should be recognized only within the narrowest limits defined by [the] principle[s]" animating them (internal quotation marks omitted)).

Third, the state secrets privilege protects the government from the duty to supply certain evidence, but it does not prevent a litigant from insisting that the government produce nonprivileged evidence in its possession. Nor does the privilege preclude a litigant from pursuing its case otherwise. As our cases explain, the trial simply "goes on" without the government's privileged proof. *General Dynamics Corp.* v. *United States*, 563 U. S. 478, 485 (2011); see also *Reynolds*, 345 U. S., at 11. In this way, the state secrets privilege again operates like many others—whether self-incrimination, attorney-client, or spousal—by suspending a party's duty to provide privileged evidence but never prohibiting an opponent from seeking nonprivileged evidence or proving its case using facts obtainable through other means. See, *e.g.*, *Schmerber* v. *California,* 384 U. S. 757,

761 (1966). In this way, too, it seems to me that the privilege seeks to respect the separation of powers. The Executive may have a national security interest in keeping certain evidence to itself. It may have an interest in avoiding the necessity of having to confirm or deny a fact. But that executive interest does not extend to quashing suits that Congress has authorized the Judiciary to entertain—and that the Judiciary has a "virtually unflagging" duty to resolve. *Colorado River Water Conservation Dist.*, 424 U. S., at 817.

Admittedly, this Court has held that some contract disputes between spies and the government may be dismissed at their outset. See *Totten* v. *United States*, 92 U. S. 105, 107 (1876); *Tenet* v. *Doe*, 544 U. S. 1, 3 (2005). But the Court has done so only on the ground and to the extent that allowing these cases to proceed would "'inevitably lead to the disclosure of' state secrets." *General Dynamics*, 563 U. S., at 486 (quoting *Totten*, 92 U. S., at 107). In rare cases like these, it may simply be impossible to adjudicate a claim without privileged evidence from the government. Still, none of that displaces the general rule that the privilege protects only against the production of certain evidence—not the inconvenience of lawsuits. If a way exists for a court to discharge its statutory duty to entertain a case without the government's privileged proof, that way must be found. Dismissal may be an easy out, but it is only rarely the correct one. Even English courts applying the old crown privilege sometimes afforded litigants the chance to prove their cases independently without the benefit of privileged proof. See, *e.g.*, *H. M. S. Bellerophon*, 44 LJR 5, 5–9 (Admlty. 1875).

Fourth, after the government properly invokes the privilege, a court may still be able to explore options to make the government's evidence available to litigants in some form as long as it fully respects the government's national security interests. Lower courts have a long history here. They

have used protective orders and other security procedures to allow sensitive governmental information to be shared—options Congress has borrowed and endorsed for use in cases arising under the Foreign Intelligence Surveillance Act of 1978 and the Classified Information Procedures Act. 50 U. S. C. §1806(f); 18 U. S. C. App. §§3–4, p. 414. Lower courts have appointed special masters with security clearances to provide unclassified summaries to litigants who lack such clearances. See, *e.g.*, *In re United States Dept. of Defense*, 848 F. 2d 232, 234 (CADC 1988). Judges have worked with executive officials to craft nonprivileged substitute versions of particular pieces of evidence. Cf. *In re Sealed Case*, 494 F. 3d 139, 153 (CADC 2007); see also 18 U. S. C. App. §6(c)(1), p. 415. Suppressing evidence from a congressionally authorized judicial proceeding may not be an appropriate remedy if valid executive interests can be fully protected by less intrusive means.

### III

The majority does not dispute that the principles set out in Part II should guide the resolution of any state secrets dispute. See *ante*, at 8–9. Instead, the majority insists that the only disagreement between us concerns "how th[e]se principles should apply to the specific discovery requests Zubaydah has made in this litigation." *Ibid.* Recall that the Ninth Circuit permitted discovery on just two things: (1) the location of the CIA's detention site, and (2) details about Zubaydah's interrogation by the CIA, his treatment, and his conditions of confinement.

### A

Start with the first of these. The Executive seeks to withhold evidence about the location of its detention site from a congressionally authorized judicial proceeding. To do so, it bears the burden of showing that a "reasonable danger" of

harm to national security would follow from sharing the information sought. *Reynolds*, 345 U. S., at 10. How does the government seek to discharge that burden in this case? Zubaydah seeks evidence from Mitchell and Jessen. The pair have long since stopped working for the government. Still, the government insists, any evidence they supply would be widely understood as speaking for the Executive Branch. Brief for United States 26. (That premise I accept for argument's sake.) And, the government continues, if the pair were asked to confirm or deny the existence of a black site in Poland, their answer could complicate efforts to secure assistance from foreign governments for future operations. *Id.*, at 27–28.

Even on its own terms, however, the government's submission faces an immediate problem. What was once a secret can, with the passage of time, become old news. See *United States* v. *Ahmad*, 499 F. 2d 851, 855 (CA3 1974). There may be cases where requiring the government to confirm a widely known but not "officially" disclosed fact could pose a national security risk sufficient to justify withholding evidence. See *ante*, at 10–11. Hypothetically, as the Court explains, demanding the government to admit "the existence of a CIA site in Country A" could "diminish the extent to which the intelligence services of Countries A, B, C, D, etc." might be willing to cooperate "with our own intelligence services in the future." *Ante*, at 11. The difficulty is, the government has not carried its burden of showing this case falls into that category.

The record before us is stark. Zubaydah's detention in Poland took place 20 years ago. The location of the CIA's detention site has been acknowledged by the former Polish President, investigated by the Council of Europe, and proven "beyond reasonable doubt" to the European Court of Human Rights. See Part I–B, *supra*. Doubtless, these disclosures may have done damage to national security interests. But nothing in the record of this case suggests that

requiring the government to acknowledge what the world already knows to be true would invite a reasonable danger of additional harm to national security. The government's only evidence is a declaration couched in conclusory terms, which the District Court found unpersuasive. See App. to Pet. for Cert. 45a, 52a–53a, 59a. It rests on the same sort of hypothetical the majority posits today—making no effort to grapple with the particulars of this case.

Even the majority seems uncomfortable with the government's declaration. The best the majority can say is this: The location of a CIA detention site in Poland qualifies as a "state secret" because "we have found nothing in the evidentiary record that casts doubt" on the declaration's conclusory assertion that national security harms could follow from acknowledging its existence. *Ante*, at 12. But notice how this effectively reverses the burden of proof. The majority starts with the government's conclusory assertion— and then proceeds to place on Zubaydah the burden of disproving it. A bare expression of national security concern becomes reason enough to deny the ancient right to every man's evidence.

This may be a nice move, but it is unpersuasive. Since *Burr*, this Court has held that the Executive must do more than assert a harm to national security "might" follow from producing evidence. See Part II–B, *supra*. Since *Reynolds*, this Court has required a "reasonable," not a speculative, showing of harm. See Part II–B, *supra*. If the government could withhold evidence and even compel the dismissal of lawsuits based on nothing more than a conclusory assertion of national security concerns—and if the burden fell on private persons to disprove those concerns—it is hard to imagine what case a court could not be forced to close. That kind of executive prerogative might have once been part of the law of England; it has never been the law here. See Parts II–B and II–C, *supra*.

Under our law, a court not fully satisfied by the government's showing of harm has a duty to inquire further. See Part II–C, *supra.* In this case, I would have thought that concerns about the conclusory nature of the government's declaration would have led the Court at least to remand the matter to the District Court for *in camera* review of any evidence the government might wish to present to substantiate its privilege claim. Crediting doubtful representations has led this Court to embarrassments in the past. See Part II–B, *supra.* I would not risk a repeat.

B

Looking past these problems only serves to expose another and maybe more fundamental one. Assume now with the government that confirming the existence of a detention site in Poland really does qualify as a state secret. Put aside that part of the Ninth Circuit's decision allowing discovery to proceed on that question. What about the Court of Appeals' separate holding that Zubaydah is entitled to discovery about his interrogation, treatment, and conditions of confinement? Recall that Zubaydah's lawyers have long maintained that, at a minimum, they should be allowed to ask about those matters within the date range of December 2002 through September 2003 and without reference to geography or Polish personnel. See Part I–C, *supra.* Recall, too, that even the government has conceded that "the enhanced interrogation techniques employed with respect to specific detainees in the program, and their conditions of confinement, are no longer classified." App. to Pet. for Cert. 143a. Normally, a statutorily authorized case must continue without the government's privileged proof. See Part II–C, *supra.* Why should this case be different and face dismissal at its outset?

A plurality of the Court answers with a worry.[13] It fears

--------

[13] JUSTICE KAGAN does not join this portion of the principal opinion and instead appears largely to agree with us in what follows.

that "any response to Zubaydah's discovery requests would inevitably tend to confirm or deny whether the CIA operated a detention site located in Poland." *Ante*, at 17. Apparently, the plurality is concerned that, during the course of their testimony about Zubaydah's treatment, Mitchell and Jessen might *inadvertently* disclose the location of their activities. See *ibid.* To ward against this possibility, the plurality insists, dismissal is the only option.

But *that* has never been enough to justify an invocation of the state secrets doctrine to shield evidence, let alone the dismissal of a lawsuit. No one cites any legal authority— even under the old crown privilege in England—allowing the Executive to withhold nonprivileged information and demand a suit's dismissal only because executive agents might accidentally disclose privileged information along the way. Surely a party's propensity for error cannot be a point in its favor.

Nor is that the only thing surprising about the plurality's argument. Many familiar judicial tools exist to protect parties from their inadvertent disclosures. In prior detainee civil litigation, the government attended Mitchell's and Jessen's depositions and instructed them not to answer certain sensitive questions. See, *e.g.*, Brief for Respondents 7–8. The District Court could insist on that same procedure here. As an added precaution, the District Court could conduct any depositions in its presence. Alternatively, the court could enter a protective order preventing the parties from sharing documents or other information with Polish authorities or the public until the government has a chance to review them. Alternatively still, Mitchell and Jessen could be directed to provide their materials to the District Court so that the court and the government would have a chance to review their submissions before they are even transmitted to Zubaydah's lawyers. It seems the government found advance review procedures like these sufficient

when it allowed Mitchell to publish a book about his in-
volvement in the CIA's interrogation program. It is unclear
why they should be insufficient now. See Part I–B, *supra*.

On top of all that, the District Court might require Mitch-
ell and Jessen to use code names or redact privileged infor-
mation when supplying their evidence. The Senate Report
used these tools, speaking of "Detention Site Blue" in lieu
of "Poland" more than 60 times and redacting certain ma-
terials from its public report, all while recounting in detail
how Mitchell and Jessen tortured *other* detainees at that
site. See Part I–B, *supra*. Mitchell and Jessen likewise
used code names to shield foreign country names when they
testified in prior civil litigation and before a military com-
mission at Guantánamo Bay. Indeed, according to an *ami-
cus*, the government even filed a motion in the military com-
mission proceedings endorsing the practice. See Brief for
Electronic Frontier Foundation as *Amicus Curiae* 23.

The plurality barely pauses to consider any of these safe-
guards against the government's potential negligence. It
acknowledges these "techniques have successfully pre-
vented the disclosure of classified information in previous
litigation on related subject matter." *Ante*, at 17. But in a
bare *ipse dixit*, the plurality asserts these same tools "would
not be effective here." *Ibid*. In failing to give careful con-
sideration to potential safeguards that would allow this
case to proceed, the plurality defies a central and consistent
teaching of this Court's state secrets jurisprudence—that
executive claims of privilege in congressionally authorized
proceedings are not to be reflexively accepted, and remedies
short of dismissal must be preferred. See Part II–C, *supra*.
The plurality confuses appropriate deference to the Execu-
tive's predictive judgments about foreign affairs with inap-
propriate deference to the Executive's concerns about its
own mishaps, misstatements, and mistakes. In the process,
the plurality abdicates judicial responsibility to use ordi-

nary tools of litigation management in favor of the Executive's wish to brush this case out the door. We do no honor to the rule of law in acquiescing to that impulse.

C

Unable to explain how the government would be harmed by allowing this litigation to continue, the plurality seeks to flip the script. Now, it contends that "much of [the] information" Zubaydah seeks "is already publicly available from other sources," so "further judicial probing of the Government's privilege claim" is unwarranted. *Ante*, at 16.

This submission faces its own problems. A litigant's necessity for the evidence he seeks may inform how far a court must go in testing the government's claim of privilege. But in all cases the government bears the burden of proving its entitlement to the privilege. See Part II–C, *supra.* And it has not carried that burden here. The government worries about confirming the location of its detention site, but it has not shown how doing so would harm national security in light of how well documented that fact already is. Worse, the government has not even shown how this lawsuit would require it to confirm the location of its detention site. We do not have in this case a question about how far to probe the government's privilege claim; we have not probed that claim at all. We have replaced independent inquiry with a rubber stamp.

Troubling, too, the plurality's argument rests on facts of its own surmise. Yes, a great deal of public information exists about Zubaydah's treatment during *other* periods. And maybe the location of his detention site is known to the world. But Zubaydah's lawyers tell us that the public record contains no comparable information about what happened "inside [his] cell" from December 2002 until September 2003. See Tr. of Oral Arg. 41. That, they say, is the primary reason this lawsuit exists. See Part I–C, *supra.* The government does not seriously dispute the comparative

lack of public evidence about Zubaydah's treatment during the relevant period—and it is unclear why the plurality pursues the point on the government's behalf. As recently as 2015, the government *rejected* a diplomatic request by Polish prosecutors seeking information about Zubaydah's treatment. Letter from B. Fletcher, Acting Solicitor General, to S. Harris, Clerk of Court 1, 3 (Oct. 15, 2021) (Government Letter).

Rather than face these problems, the plurality attempts a way around them. Perhaps Zubaydah does not yet have the information he needs. But, the plurality replies, we recently received a letter from the government. In it, the government says it will now allow Zubaydah to mail a document from Guantánamo Bay to Polish prosecutors detailing his treatment during the relevant period. So at least in this way, the plurality reasons, Zubaydah's need for evidence from Mitchell and Jessen "may" become "diminished" in the future. *Ante*, at 16.

It is easy enough to see why the plurality hedges here. Not only has the government already once refused a request from Polish authorities asking for information about Zubaydah's treatment. The government's apparent change of heart came only after argument in this case, in response to questions from the bench. And a closer look at the government's offer unmasks its emptiness. No one seems confident that Zubaydah remains mentally competent to testify about his treatment decades ago.[14] Pointedly, too, the government states in its letter that it reserves the right to subject whatever he produces "to a security review"—all without indicating what standards it will apply in that "review." Government Letter 3. In the end, then, the government's offer seems little more than an offer to let Zubaydah

—————————
[14] Zubaydah's lawyers represent that they do not know "whether and to what extent, after years of torture and solitary confinement, he can still reliably reconstruct this history." Letter from D. Klein, Counsel for Respondent Abu Zubaydah, to S. Harris, Clerk of Court 2 (Oct. 25, 2021).

say whatever the government chooses to allow him to say.

Then there is this. In response to the government's letter, Zubaydah's lawyers have lodged their own. In it, as they have before, they offer a middle way. At the very least, Zubaydah's lawyers ask this Court to hold off dismissing this case until we know whether and to what extent the government will make good on its late-blooming promise. Letter from D. Klein, Counsel for Respondent Abu Zubaydah, to S. Harris, Clerk of Court 2 (Oct. 25, 2021). Yet rather than remand this case to allow the District Court to supervise that process, the plurality refuses even this paltry accommodation. It does so without as much as the courtesy of an explanation.

D

Ultimately, the plurality is forced to give ground. While it insists that "any" response to Zubaydah's current requests "would inevitably tend to confirm or deny whether the CIA operated a detention site located in Poland," it goes out of its way to note that "a different discovery request filed by Zubaydah might avoid the problems" the plurality believes exist here. *Ante*, at 17. In other words, it seems that Zubaydah remains free to file a new lawsuit seeking information about his interrogation, treatment, and conditions of confinement as long as he does not ask for location information where his "need is not great." *Id.,* at 15, 17.

But what is the point of forcing Zubaydah to file a new lawsuit? Location information is only part of what the Court of Appeals permitted and Zubaydah seeks. Separately, the Court of Appeals allowed Zubaydah's lawyers to inquire about his interrogation, treatment, and conditions of confinement. And throughout this litigation, Zubaydah's lawyers have indicated a willingness to employ any number of tools to disaggregate that evidence from information that might reveal the site's location or the involvement of foreign

nationals. As they put it before the District Court, "[v]aluable discovery may proceed without requiring [Mitchell and Jessen] to confirm either the location of any particular site, or the cooperation of any particular government." App. to Pet. for Cert. 42a. As the District Court acknowledged, too, courts possess substantial authority to "modify or limit the scope" of any party's discovery requests. *Id.*, at 55a. It is unfathomable why this Court should ignore that option in this case and insist on a new one. At worst, the delay may effectively deny Zubaydah congressionally authorized discovery into admittedly nonprivileged information. At best, it will prove a pointless formality.

\*

In the end, only one argument for dismissing this case at its outset begins to make sense. It has nothing to do with speculation that government agents might accidentally blurt out the word "Poland." It has nothing to do with the fiction that Zubaydah is free to testify about his experiences as he wishes. It has nothing to do with fears about courts being unable to apply familiar tools to disaggregate discovery regarding some issues (location, foreign nationals) from others (interrogation techniques, treatment, and conditions of confinement). Really, it seems that the government wants this suit dismissed because it hopes to impede the Polish criminal investigation and avoid (or at least delay) further embarrassment for past misdeeds. Perhaps at one level this is easy enough to understand. The facts are hard to face. We know already that our government treated Zubaydah brutally—more than 80 waterboarding sessions, hundreds of hours of live burial, and what it calls "rectal rehydration." Further evidence along the same lines may lie in the government's vaults. But as embarrassing as these facts may be, there is no state secret here. This Court's duty is to the rule of law and the search for truth. We should not let shame obscure our vision.